A.L. COOPER; Kay Buston; Richard L. Stott; Vernon T. Delgado; Harry P. Schriver; Robert Carmean; Ralph Allen Steele; Phil Gabardi; Dennis Davison; and P.J. Paulos, Appellants (Plaintiffs),

v.

TOWN OF PINEDALE, Appellee (Defendant).

No. 98–291.

Supreme Court of Wyoming.

March 30, 2000.*

---

* This case was originally assigned to Justice Thomas on February 16, 1999, for the rendering of a proffered majority opinion. This case was reassigned to Justice Hill on December 16, 1999. Justice Hill distributed a proffered opinion to the Court on March 9, 2000.

Representing Appellants: John S. Mackey, Pinedale, WY; and Philip White Jr., Laramie, WY. Argument presented by Mr. White.

Representing Appellee: Van Graham of Mason & Graham, Pinedale, WY. Argument presented by Mr. Graham.

Representing Amicus Curiae Wyoming Association of Municipalities: Kathleen A. Hunt of Lewis & Hunt, LLC, Laramie, WY.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

HILL, Justice.

The Appellants, taxpayers and water service purchasers (collectively Cooper), challenge the authority of the Town of Pinedale (Town) to borrow money from the State of Wyoming for the purpose of reconstructing the municipal water system. The district court ruled that Wyo. Stat. Ann. § 15–1–103(a)(xlii)(Michie 1997)[1] was a specific statute affording such authority to the Town, and it also ruled that the question had become moot because of the construction of the water system. We hold that the matter had not become moot, but we agree with the district court that the Town possessed the authority to act under the circumstances of this case. We affirm the Order of the district court granting a summary judgment in favor of the Town.

## ISSUES

This Statement of the Issues is found in the Brief of Appellants:

I. Did the trial court err in its determination that the matter was moot:

a) when, under the law, a municipal obligation entered into without observance of statutory and constitutional requirements is void *ab initio;*

b) where there is no evidence in the record that the Town has already im-

---

1. The statutes applicable to this matter were the subject of significant amendments after this action was filed. Unless otherwise noted, all statu-

tory references are to the version of the statute in effect at the time this matter arose.

posed all water assessments necessary to meet its repayment obligations under the loan, and thus a judgment declaring the Town is without authority to impose those assessments would be effective and enforceable;

c) when there is no evidence in the record to indicate that the state loan has been advanced to or spent by the Town of Pinedale;

d) where the trial court improperly took "judicial notice" of a water project and thereby decided an issue of fact;

e) when it was the Town that delayed a decision by insisting on oral argument instead of a ruling on the briefs, and by taking several months to modify the promissory note.

II. Did the trial court err in ruling that Wyoming Statutes did not require approval at an election before the Town Council could legally enter into a binding indebtedness for this loan[?]

III. Did the trial court err in ruling that under Wyoming law a mere resolution of the Town Council, rather than an ordinance, was sufficient to legally authorize Town officials to incur a $1,171,500 debt by signing the note, mortgage and other documents evidencing the loan? Was passage of a motion sufficient to modify the note?

IV. Do the Wyoming Constitution Art. 16 § 4 and W.S. § 15–7–109 require approval at an election of Town of Pinedale residents to legally enter into this indebtedness, in that the Town has mortgaged not just the new pipeline to be constructed with the loan, but all of the Town's existing water facilities and water rights as well?

This Statement of the Issues is found in the Brief of Appellee:

I. Whether the trial court erred in finding the appellants' action moot?

II. Whether the trial court erred in ruling that the promissory note executed by the Town of Pinedale in favor of the State of Wyoming is not a bond requiring an election?

III. Whether the trial court erred in ruling that the Town of Pinedale could become a party to a promissory note by authority of a resolution?

IV. Whether the constitutional issue raised by appellants can be raised for the first time on appeal?

The Wyoming Association of Municipalities, as amicus curiae, accepts the statement of the issues set forth in Appellee's brief. The Reply Brief of Appellants raises no new issues.

### FACTS

The Wyoming Legislature passed an Omnibus Water Bill in 1996 that authorized a grant and a loan to the Town of Pinedale for the construction of a new municipal and domestic water supply. The legislation provided for a grant of up to $2,378,500.00 and a loan of up to $1,171,500.00. On April 29, 1996, the State's Water Development Commission (the Commission) sent the Town's mayor, Miriam Carlson (Carlson), a project agreement, promissory note, mortgage, and assignment and pledge of revenues. An accompanying letter instructed Carlson to, among other things, "... have the Town Council pass a resolution consistent with the wording in the Assignment and Pledge form." One week later, the Town Council passed the required resolution, and Carlson executed the documents.

Cooper filed a Complaint for Declaratory Judgment on July 2, 1997, asking the district court to declare that the Town had no authority to enter into the loan agreement. Cooper argued that the Town violated the Wyoming Constitution and state statutes by entering into the loan without voter approval. Amid extensive briefing and motion practice, the parties entered into negotiations. As a result of the negotiations, the Town persuaded the Commission to modify the promissory note to specify that the Town would pay the note only with water revenues. On February 3, 1998, the Town Council passed a resolution to approve the modification.

The parties filed cross-motions for summary judgment. On July 30, 1998, the parties stipulated that no constitutional issues remained, and the only unresolved issues were:

9.1 whether the note is a bond requiring an election pursuant to Wyo. Stat. § 15–7–102(b) and Wyo. Stat. §§ 22–21–101 et seq., or whether the Town of Pinedale could enter into the indebtedness without an election pursuant to its authority under Wyo. Stat. § 15–1–103(a)(xlii); and

9.2 whether the actions taken by the Town of Pinedale could be taken pursuant to resolutions rather than pursuant to ordinances.

The district court heard oral arguments on the respective motions for summary judgment on July 31, 1998. In ruling in favor of the Town's motion for summary judgment, the court concluded that the case was moot, reasoning that work had already begun on the project, expenses incurred, and that no matter the outcome, an election could not change those facts. The court went on to provide alternative findings on the merits, which also favored the Town.

Cooper filed a Motion to Reconsider and/or Alter or Amend Order, which the district court denied. Cooper filed a timely Notice of Appeal to this Court. After receiving the appellate briefs of both parties, we granted the petition of the Wyoming Association of Municipalities to file a brief amicus curiae.

## STANDARD OF REVIEW

Our standard when reviewing a district court's grant of summary judgment is found in W.R.C.P. 56 and *Cities Serv. Oil & Gas v. State,* 838 P.2d 146, 150 (Wyo.1992). In accordance with the cited rule, we will affirm a summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Id.* We will examine the record from the point of view most favorable to the party opposing the summary judgment and give that party the benefit of all favorable inferences that we may fairly draw from the record. *Davis v. Wyoming Medical Center, Inc.* 934 P.2d 1246, 1250 (Wyo.1997). In the case before us, the parties have agreed that no material facts are in dispute. We, therefore, have only to determine whether the district court properly granted summary

judgment as a matter of law. *Cities Serv. Oil & Gas,* 838 P.2d at 150.

Because the parties' arguments depend upon conflicting interpretations of statutes, a review of our rules of statutory construction is also in order. Our controlling consideration in interpreting statutes is the intent of the legislature. *Wright v. State ex rel. Workers Safety,* 952 P.2d 209, 213 (Wyo. 1998). To ascertain that intent, we construe statutes *in pari materia* with other statutes. *Corkill v. Knowles,* 955 P.2d 438, 445 (Wyo. 1998). When possible, we will harmonize statutes relating to the same subject matter. *Gerstell v. Dept. of Revenue & Taxation,* 769 P.2d 389, 394 (Wyo.1989). Accordingly, we apply the rule that a specific statute will govern over a general statute. *Id.*

As another preliminary matter, we recall a prior discussion relating to the powers of cities and towns:

Before reviewing and discussing the various statutory provisions which we consider applicable to the facts of this appeal, it is necessary to review some general principles of law regarding the powers of a municipal corporation to legislate.

It is settled that municipal corporations are creatures of the legislature and thereby subject to statutory control. 2 McQuillin Mun Corp (3d Ed), § 4.03, p. 8; *Wyoming State Treasurer v. City of Rawlins,* Wyo., 510 P.2d 301 (1973). Thus, the legislature, except as limited by the Wyoming Constitution, may confer on municipal corporations such authority as it considers proper, and municipalities can exercise only those powers which are expressly or impliedly conferred. 2 McQuillin, supra, §§ 10.08 and 10.09, p. 755; *City of Buffalo v. Joslyn,* Wyo., 527 P.2d 1106 (1974); *Scarlett v. Town Council, Town of Jackson, Teton County,* Wyo., 463 P.2d 26 (1969); *May v. City of Laramie,* 58 Wyo. 240, 131 P.2d 300 (1942); *Edwards v. City of Cheyenne,* 19 Wyo. 110, 111, 114 P. 677 (1911). We have recognized in the past that the powers of a municipality are not necessarily limited to those expressly conferred but that a municipality may also exercise powers fairly and necessarily implied from the grant contained in the stat-

ute or constitutional provision. *Whipps v. Town of Greybull*, 56 Wyo. 355, 109 P.2d 805, 146 ALR 596 (1941).

*Coulter v. City of Rawlins*, 662 P.2d 888, 894–95 (Wyo.1983).

## DISCUSSION

*Mootness*

 We must first decide whether the district court erred in determining that the matter was moot. A case is 'moot' "[w]hen the determination of a matter is sought which, if provided, cannot have any practical effect on the existing controversy[.]" *McLain v. Anderson*, 933 P.2d 468, 472 (Wyo.1997). While this Court has not yet expressly delineated the standard for reviewing a claim of mootness, the general rule is that a finding of mootness is reviewed *de novo* because it is a question of law. *Fund for Animals v. Babbitt*, 89 F.3d 128, 132 (2nd Cir.1996).

The district court raised the issue of mootness on its own motion. In its order, the court said:

> At the time of the hearing the Pinedale water project . . . was already under construction and at least partially completed. During oral arguments the Court questioned counsel for both parties as to the Court's ability to finally determine the rights of the parties as is required in a declaratory judgment action. The Court was concerned that a judgment for Plaintiffs would require an election. If that election failed the loan from the state to the Town of Pinedale would not just vanish, nor would the water project either complete itself or undo itself. More litigation would be required to determine the disposition of numerous matters if such events transpired.

The district court went on to say, "[a]lthough this matter is one of great public interest and importance this controversy was presented to the Court at such a late stage of the water project as to render any decision of the Court in favor of Plaintiffs moot." The court concluded its discussion of mootness by saying:

> Even if this controversy was not moot at the time it was filed it has since become moot with the start of construction on the water project itself sometime this year. The Court takes judicial notice [that] construction on the water project is visible in Pinedale.

In the trial court's explanation of its holding, we find reason to reverse. The court expressed concern that should an election fail, "[m]ore litigation would be required to determine the disposition of numerous matters[.]" That line of reasoning seems to confuse inconvenience with impossibility. In addition, the indebtedness incurred in furtherance of the project is still extant, and the Appellants will be required to assist in the repayment of that debt through higher water costs. Clearly, they are being, and will continue to be, harmed by any illegality which might exist as the result of the Town's actions. We, therefore, hold that a decision in this case would be effectual, and the district court erred in finding it moot.

*Election Requirement*

 Before beginning our analysis, we need to review the relevant statutory scheme in effect at the time Cooper filed this action. Title 15 sets forth general and specific provisions relating to the powers, rights, duties, and obligations of cities and towns. The provisions relevant to this proceeding are found in Wyo. Stat. Ann. § 15–1–103 (Michie 1997):

> (a) The governing bodies of all cities and towns may:
>
> . . . .
>
> (x) Borrow money on the credit of the corporation for corporate purposes as allowed by the constitution and the laws and issue warrants and bonds therefor in such amounts and forms and on such conditions as they determine;
>
> . . . .
>
> (xlii) Take any action necessary to acquire any needed or useful property, or to construct, maintain, repair or replace any lawful improvement, development, project or other activity of any kind, or to participate, join or cooperate with other governments or political subdivisions,

or departments or agencies thereof, for which funds may be borrowed from, granted or made available in whole or in part, on a matching basis or otherwise, by the United States of America or the state of Wyoming, or any subdivision, department or agency of either[.]

More specifically, Chapter 7 of Title 15 establishes the parameters of a city's or town's authority in relation to public improvements, including water systems:

(a) In addition to all other powers provided by law, any city or town may make public improvements as follows for which bonds may be issued to the contractor or be sold as provided in this chapter to:

. . . .

(ii) Establish, construct, purchase, extend, maintain and regulate a system of water works, for the purpose of supplying water for extinguishing fires and for domestic, manufacturing and other purposes. To carry out this power, or to prevent pollution or injury to the streams, springs or source of supply of its water works, ditches or reservoirs, any city or town may go beyond its corporate limits and take, hold and acquire property. . . . Jurisdiction of a city or town shall extend up and along the stream or source of supply for the entire distance occupied by such water works, ditches or reservoirs. Cities or towns may enact ordinances and make all necessary rules and regulations for the government and protection of their water works, ditches and reservoirs, and fix water rates and provide for their collection. All water rent collected except the amount required to pay the expense of maintaining, extending and improving the water works, shall become a part of the water bond fund, and be applied only to the payment of the principal and interest of the bonds issued for the construction, purchase, maintaining or extension of the water works;

(iii) Take any action necessary to establish, purchase, extend, maintain and regulate a water system for supplying water to its inhabitants and for any other public purposes, including:

(A) Condemnation of property;

(B) Prescribing and regulating of rates for the use of water; and

(C) Enacting ordinances for their enforcement and collection.

. . . .

(xiv) Take any action necessary to acquire any needed or useful property, or construct, maintain, repair or replace any lawful improvement, development, project or other activity of any kind or to participate, join or cooperate with other governments or political subdivisions, departments or agencies thereof, for which funds may be borrowed from the United States of America or the state of Wyoming, or any subdivision, department or agency of either[.]

To provide for the financing of water and other public improvement projects, Wyo. Stat. Ann. § 15–7–102 (Michie 1997) authorizes a city or town to issue bonds subject to certain limitations:

(a) A city or town may borrow money and issue bonds in either coupon or registered form to any amount not exceeding the limitation provided in W.S. 15–7–109 for the purposes enumerated in this article. . . .

(b) No bonds may be issued for the purposes provided in this article until the proposition to issue them has been submitted to and approved by the qualified electors of the city or town at an election which shall be called, conducted, canvassed and returned in the manner provided for bond elections by the Political Subdivision Bond Election Law, W.S. 22–21–101 through 22–21–112.

Finally, the Political Subdivision Bond Election Law, Wyo. Stat. Ann. §§ 22–21–101 through 22–21–112, sets forth the means and manner in which a city or town shall hold an election for the approval of any bond issues. However, the provisions of the Political Subdivision Bond Election Law are only applicable when an election is required by law. *Frank v. City of Cody,* 572 P.2d 1106, 1119 (Wyo.1977); Wyo. Stat. Ann. § 22–21–101 (Michie 1997). In other words, the Political Subdivision Bond Election Law does not es-

tablish when an election is required; instead, it sets forth "uniform procedures to be followed when an election is *required* prior to issuance of bonds of any sort." *Frank,* 572 P.2d at 1119. (Emphasis in original.)

■ Because Title 15 contains no definition of "bond," Cooper seeks to incorporate the following definition found in § 22–21–102:

(a) As used in this chapter:

. . . .

(ii) "Bond" means any bond, note, certificate of indebtedness, coupon, or other obligation for the payment of money, issued by any political subdivision, including any bond payable from taxes, revenues or other sources.

Having secured a broad definition of "bond," Cooper argues that §§ 15–7–102(b) and 15–7–101(a)(ii) mandate an election for prior approval of the indebtedness entered into by the Town in this instance. The Town, naturally, disagrees with Cooper, insisting that the indebtedness is not a "bond," rather, it is a loan. Furthermore, the Town points out that § 15–1–103(a)(xlii) specifically authorizes "any action necessary" for any lawful improvement for which funds have been made available, in whole or in part, by the State of Wyoming. The Town contends that in order for this provision to have meaning, even if the promissory note is considered a "bond," no election is required when the funds for the improvement are derived from the State.

Initially, we must determine what the legislature meant by a "bond" since elections are only required pursuant to § 15–7–102(b) for the issuance of "bonds" and nothing else. Our review of the relevant statutes leads to a rejection of Cooper's attempt to import the definition of "bond" found in the Political Subdivision Bond Election Law into Title 15 for two reasons. First, the definition of "bond" formerly found at § 22–21–102 is specifically limited by its terms to "as used in this chapter"—the Political Subdivision Bond Election Law. Wyo. Stat. Ann. § 22–21–102(a) (Michie 1997). Furthermore, we noted as long ago as 1977 that the Political Subdivision Bond Election Law is applicable only if some other statutory provision requires an election in the first instance. *Frank,* 572 P.2d at 1119. Cooper's position,

in effect, seeks to bootstrap an election requirement per Title 15 through the use of the definition found in the Political Subdivision Bond Election Law, which is not applicable unless Title 15 requires an election. Such a twisting of the statutes would clearly run against the legislature's intent since, if the legislature had desired, it could have easily made the definition of "bond" found in the Political Subdivision Bond Election Law applicable outside the scope of that particular law. It chose not to do so and, indeed, the definition was specifically limited to that law. Therefore, we must turn elsewhere to determine what the legislature meant when it used the term "bond" in Title 15.

Since "bond" is not defined in Title 15 and there is no other definition of the term appropriate to its context in that title located elsewhere in our statutes, we look to other sources. Black's Law Dictionary contains general and specialized definitions of "bond":

**Bond.** A long-term, interest-bearing debt instrument issued by a corporation or governmental entity usually to provide for a particular financial need; especially, such an instrument in which the debt is secured by a lien on the issuer's property.

"Typically debt securities are notes, debentures, and bonds. Technically a 'debenture' is an unsecured corporate obligation while a 'bond' is secured by a lien or mortgage on corporate property. However, the word 'bond' is often used indiscriminately to cover both bonds and debentures. . . . A 'bond' is a long term debt security while a 'note' is usually a shorter term obligation. Bonds are historically bearer instruments, negotiable by delivery, issued in multiples of $1,000 with interest payments represented by coupons that are periodically clipped and submitted for payment." Robert W. Hamilton, *The Law of Corporations in a Nutshell* 128 (3d ed.1991).

. . . .

*Municipal Bond.* A bond issued by a nonfederal government or governmental unit, such as a state bond to finance local improvements. The interest received from a municipal bond may be exempt from feder-

al, state, and local taxes. Often shortened (in plural) to *municipals; munies.*—Also termed *municipal security.*

Black's Law Dictionary 172 (7th ed.1999). A definition for "promissory note" can also be located in the same source:

> **[Promissory] Note.** A written promise by one party (the *maker*) to pay money to another party (the *payee*) or to bearer. A note is a two-party negotiable instrument, unlike a draft (which is a three-party instrument).—Also termed a *promissory note.*

Black's Law Dictionary 1085.

There is no dispute that the indebtedness at issue in this case fits within the ordinary definition of a promissory note: It clearly is a "two-party negotiable instrument." On the other hand, the Town's indebtedness does not appear to fit the definition of "bond": It is not a bearer instrument, negotiable by delivery with interest payments represented by coupons. Furthermore, we should also consider the following:

> State and local governments issue long-term municipal bonds to finance capital expenditures on projects where the benefits accrue for more than one year. Issues for public purposes range from the construction of schools, hospitals, highways, and utility plants to expenditures for equipment, police cars, and pollution control facilities....
>
> Municipal bonds exhibit the same basic features as other long-term fixed-income securities, except that the issuer can be any state or local government or one of their political subdivisions. Each issue specifies a final maturity when the entire principal borrowed is repaid. Even though the final principal payment may be scheduled for 30 years after the original issue date, most municipals are offered as serial bonds, where a portion of the total principal matures each year. The size of each periodic interest payment is determined by a set coupon rate indicating the percentage of the bond's par value that is paid annually to bondholders. While this rate is stated as an annual percentage, most municipal bonds pay coupon interest semiannually equal to one half of the annu-

al coupon rate. Finally, each underlying bond carries a market yield or price that is determined by prevailing market conditions. Bonds sold at par carry a price stated at 100 percent with the market rate of interest equal to the bond's coupon rate. A bond is sold at a discount when the quoted price is less than 100 percent of par, such that the effective market yield exceeds the bond's coupon rate. A premium bond, in contrast, is priced above 100 percent of par and carries a market yield below the associated coupon rate.

. . . .

Municipal bonds are generally classified as either general obligation or revenue bonds, depending on how the issuer commits to raising funds to repay principal and interest. In fact, many municipals are of neither type in a pure sense but rather hybrids that incorporate features of each.

General obligation bonds typically finance essential public-purpose expenditures for education, roads, water treatment facilities, and other general community services. Principal and interest payments are secured by the issuer's full faith, credit, and taxing authority. Thus, a governmental unit pledges to raise taxes, if necessary, to meet debt service requirements. This is the strongest commitment a municipal borrower can make. The likelihood of default is thus typically low depending on the viability of the issuer's tax base and ability to increase tax collections.

General obligation bonds exhibit two characteristics that differentiate them from other municipals. First, voters within the issuer's jurisdiction generally must approve any new bond offering. This derives from the government's authority to raise taxes in support of the debt service as voters essentially ratify a possible tax increase. Second, there is no direct association between who uses the facility financed and who pays for it. School bonds represent a common example. Principal and interest payments are covered by property taxes, so that all property owners in the community finance the schools rather than just those families with children in school. Not surprisingly, voter approval

limits the volume of new issues because many individuals prefer not to pay more in taxes for many projects or purposes....

....

State and local governments issue revenue bonds to finance projects that produce specific revenues that are, in turn, used to make principal and interest payments. Hospital revenue bonds represent one example, where the bond proceeds finance the expansion of hospital facilities and equipment. Debt service is secured by anticipated user fees and related hospital revenues. Unlike general obligations, revenue bonds do not require voter approval and there are few restrictions regarding the amount of revenue debt that can be issued. Because each bond is backed by a specific revenue source, default risk varies with the strength and predictability of the underlying revenue stream. Some revenue bonds thus exhibit low risk, while others are extremely risky. Investors should carefully review a revenue bond prospectus, however, because it is often difficult to determine which entity and what revenues actually support debt service.

Revenue bonds are generally referred to by the source of revenues pledged against debt service. Public-purpose revenues can be classified as user fees (water, sewer, hospital, and electric fees), tolls (transportation charges), or special assessments (university and housing revenues). Private-purpose revenues typically consist of lease payments from private firms that use facilities leased from municipalities.

Dennis E. Logue, *Handbook of Modern Finance* § A6.05[1], [3]-[4] pp. A6-9 to A6-12 (2000 Ed.); *See also* 1 M. David Gelfand, *State & Local Government Debt Financing,* Chapter 2 *passim* (1999). Another source defines municipal bonds thus:

A municipal bond is an agreement by a municipal corporation to pay to the holder of the bond a certain specified amount at a designated future time, and to pay interest annually or semiannually. Public bonds constitute contracts.

In its ordinary commercial sense, a municipal bond is a negotiable bond issued by a municipal corporation to secure its indebtedness. The term itself imports a municipal debt or obligation; and, in legislative usage, it ordinarily connotes bonded indebtedness. Municipal bonds are evidences of indebtedness intended for sale in the market with the object of raising money for municipal improvements, the expense of which is beyond the immediate resources of reasonable taxation, and payment of which necessarily or logically should be distributed over a period of years.

64A C.J.S., *Municipal Corporations* § 1645, p. 210 (1999). A further characteristic common to municipal bonds is that the interest bondholders receive is exempt from federal income taxation. 1 Gelfand, *State & Local Government Debt Financing* at §§ 5:08–5:11.

■ The indebtedness the Town has incurred here has none of the traditional indicia of a municipal bond: There are no multiple investors, no prospectus, no coupon rate or market yield or rate, and no tax exemptions for interest payments exist. The question we must confront, then, is whether the legislature intended for "bond" to mean that term in a broad, generic sense; or, did the legislature intend for "bond" to have a more specific, technical or commercial meaning? We conclude the latter.

First, if we were to accept Cooper's position that a broad meaning should be ascribed to the word "bond" in Title 15, then it is difficult to imagine what purpose § 15–1–103(a)(xlii) could serve. That subsection provides specific authority for a municipality to "take any action necessary" to construct any lawful improvement, development, project or other activity such as the water system in this case when funds are available from a federal or state governmental source on a grant or loan basis. If the term "bond" included such means of financing within its ambit, then it would have not been necessary for the legislature to add that particular provision since "bonds" are already specifically authorized under § 15–7–102(a). *Saldana v. State,* 846 P.2d 604, 612 (Wyo.1993) (No statute should be interpreted so that any portion of it would be rendered meaningless.).

Furthermore, amendments to Title 15, enacted after this action was begun, support the narrow, technical definition for a "bond." While these amendments are not applicable in this case, they may be useful in illuminating the legislature's intent. In 1999, the legislature amended § 15–1–103(a)(xlii) by making it subject to a new subsection:

(d) Before the governing body of a city or town enters into an agreement to borrow money from the United States of America or from the state of Wyoming, or from any subdivision, agency or department of either, to fund a public improvement project to be repaid solely from revenues generated by the enterprise with which the financed project is associated, the proposal to enter into the loan agreement shall be submitted to and approved by the electors of the city or town in the same manner and pursuant to the same procedures as provided for bond issues under the Political Subdivision Bond Election Law, if the total amount to be borrowed for the project exceeds the greater of:

(i) Five million dollars ($5,000,000.00); or

(ii) An amount calculated by multiplying the number of individuals to be served by the proposed public improvement project times one thousand two hundred dollars ($1,200.00).

Wyo. Stat. Ann. § 15–1–103(d) (LEXIS 1999). Simultaneously, the legislature also amended § 15–7–102 by adding a new subsection:

(c) Notwithstanding any provision of W.S. 22–21–101 through 22–21–112, for purposes of this section, where repayment of funds borrowed from the United States of America or from the state of Wyoming, or from any subdivision, agency or department of either, is to be made solely from revenues generated by the enterprise with which the financed public improvement project is associated and where security for the loan is restricted to a claim on the revenues generated from the enterprise with which the proposed public improvement project is associated and to the assets of that enterprise, any document evidencing the agreement to repay the borrowed funds shall

not be considered a bond and no election shall be required.

1999 Wyo. Session Laws, Ch. 107, Section 1. These amendments clarify whether or not a loan from a governmental agency should be considered a "bond" within the context of Title 15. Clearly, the answer is "no;" otherwise, there would be no need for these provisions which treat such loans separately from "bonds."

We can find further, though circumstantial, evidence that the legislature did not intend for these types of loans to be considered as "bonds" through the language of the act approving this project. Throughout the enabling legislation for the project at issue here, the legislature uses the word "shall" repeatedly: The Wyoming water department commissioner shall contract with the municipality for the "design, construction and operation of the project;" the State of Wyoming shall lend to the Town $1,171,500.00 for the project; the Town shall offer security for the project loan; the Town shall establish a sinking fund for repair and maintenance of the project; and, all payments on the project loan shall be paid into a water development account. 1996 Wyo. Session Laws, Ch. 59; see Appendix. It is clear from reading the legislation, that the implementation of the project is absolutely contemplated. There are no provisions for an election, nor is the loan and grant authorized therein contingent upon any event.

Taking the language and statutory scheme of Title 15, along with the subsequent legislative amendments thereto and the language of the legislation authorizing the project, we can only conclude that the legislature did not intend for the type of financing at issue here to be considered a "bond" under the provisions of that title. Therefore, since the loan for this project is not a "bond," there is no statutory requirement for an election prior to the Town's incurring the debt.

*Resolution versus Ordinance*

■ Cooper argues that the Town was required to pass an ordinance authorizing the debt, rather than doing so with a resolution. Similarly, he contends that the modification of the promissory note was likewise invalid

because it was accomplished through resolution and not the passage of an ordinance. Cooper bases his argument on Wyo. Stat. Ann. § 15-1-114(a) (Michie 1997), which states that: "[a]ll municipal legislation shall be by ordinance, unless provided otherwise by law[.]" In addition, he notes that before an ordinance can become effective, it must be published in a local newspaper or posted for ten days in the city clerk's office. Wyo. Stat. Ann. § 15-1-116 (Michie 1997). Cooper contends that since the Town neither published nor posted its action regarding the debt, the resolution cannot in any way be considered an ordinance and, hence, the Town's approval of the debt was void.

Our statutes do not define "legislation" as that term is used in § 15-1-114(a). However, other authorities have considered what that term means in the context of the difference between resolutions and ordinances:

A resolution in effect encompasses all actions of the municipal body other than ordinances. Whether the municipal body should do a particular thing by resolution or ordinance depends on the forms to be observed in doing the thing and on the proper construction of the charter. In this connection it may be observed that a resolution deals with matters of a special or temporary character; an ordinance prescribes some permanent rule of conduct or government, to continue in force until the ordinance is repealed. An ordinance is distinctively a legislative act; a resolution, generally speaking, is simply an expression of opinion or mind or policy concerning some particular item of business coming within the legislative body's official cognizance, ordinarily ministerial in character and relating to the administrative business of the municipality.

5 Eugene McQuillan, Municipal Corporations, *Nature and Operation of Ordinances* § 15.02 p. 59 (3rd Ed.1996). In this case, the signing of the loan agreement by the city does not constitute a permanent act or a rule of general applicability. Indeed, given the mandatory language used by the legislature in approving the appropriation of funds for the project, it is arguable that the Town had little choice in deciding whether to enter into the debt. In that situation, a resolution is clearly appropriate since the actual signing of the debt instrument is strictly a ministerial act.

Furthermore, in *Thomas v. Jultak*, 68 Wyo. 198, 231 P.2d 974 (1951), this Court considered whether or not the City of Cheyenne could vacate a portion of an alley. The City had effectuated its vacation of the alley through a resolution of the city council subsequently signed by the mayor. In the course of decision we stated:

We may incidentally mention that whether or not the alley was vacated by resolution rather than ordinance makes no difference in the absence of a statute to the contrary.

*Thomas*, 231 P.2d at 981 (citations omitted). The legislature has specifically authorized the Town to incur debt based on funds provided by other governmental agencies. Wyo. Stat. Ann. § 15-1-103(a)(xlii) (LEXIS 1999). However, it has not required a concomitant obligation to do so exclusively through an ordinance. The legislature has required that other acts by municipalities be accomplished by ordinance only. *See*, e.g., § 15-1-103(a)(viii) (appropriation of money). Under these circumstances, we can only conclude that absent a specific requirement that it act by ordinance, the Town could act by resolution.

*Constitutional challenge*

■ Cooper argues that the loan violates Wyoming Constitution Article 16, Section 4, which provides:

No debt in excess of the taxes for the current year shall, in any manner, be created by any county or subdivision thereof, or any city, town or village, or any subdivision thereof in the State of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people thereof and by them approved.

Cooper initially raised this argument before the trial court. However, Cooper expressly stipulated during the proceeding below that:

Based upon said Modification of Promissory Note, [Cooper] and [the Town] have resolved all issues raised in the pleadings having to do with whether the indebted-

ness required an election pursuant to the Constitution of the State of Wyoming.

The parties stipulated that the only remaining, unresolved issues were whether the loan was a "bond," and whether the Town's approval of the loan required an ordinance rather than just a resolution. The trial court only considered and decided the latter two issues, not the constitutional question.

■ Our general rule is that we will not consider issues not raised in the court below. *WW Enterprises, Inc. v. City of Cheyenne*, 956 P.2d 353, 356 (Wyo.1998). There are only two exceptions to that rule: when the issue raises jurisdictional questions or it is of such a fundamental nature that it must be considered. *Id.; Bredthauer v. TSP*, 864 P.2d 442, 447 (Wyo.1993). We do not believe that whether or not the loan violates a constitutional provision constitutes an issue of such fundamental nature that we must resolve it. *See WW Enterprises, Inc.*, 956 P.2d at 356 (substantive due process claim not raised below and not considered on appeal). Cooper voluntarily entered into a stipulation below disposing of this issue. It would be unfair to the trial court, the Town, and the interests of justice for us to consider this issue now. It only makes sense that parties be held to their agreements.

## CONCLUSION

We find that the district court erred in concluding that this matter was moot, and that portion of its Order is vacated. However, based on the statutory language, construction, and subsequent legislative amendments thereto, we conclude that the indebtedness incurred by the Town was not a bond and, hence, no election was required. It is also clear that the Town could appropriately enter into the indebtedness through a resolution rather than an ordinance. Finally, we decline to consider Cooper's constitutional argument based on his explicit agreement to abandon that claim below.

The district court's Order is vacated in part and affirmed in part.

## APPENDIX

CHAPTER 59

OMNIBUS WATER BILL–CONSTRUCTION

Original Senate File No.32

AN ACT relating to water development projects; authorizing construction of designated water projects; describing projects; specifying terms and conditions of funding for projects; providing restrictions relating to sales of water and operation of projects; providing appropriations; modifying project descriptions, terms or appropriations for various prior projects including the Deer Creek Project, Sheridan Area Water Supply Project, Big Horn Rural Water Supply Project, Buffalo Municipal Reservoir Project, Buffalo Hydropower Project, Goshen Pump Station Project, Cheyenne Stage I Pipeline Project, Greybull Valley Dam and Reservoir Project, Basin Area Water Supply Project, Big Piney Water Supply Project, Gillette Madison Well Field Expansion Project, Laramie Water Supply Project, Natrona County Regional Water Supply Project, Gillette Fort Union Well Field Project, Laramie Rehabilitation Project, the Natrona County Regional Rehabilitation Project and the Wind River Indian Reservation Project; providing definitions; and providing for an effective date.

*Be It Enacted by the Legislature of the State of Wyoming:*

**Section 1.** *Definitions.*

(a) As used in this act:

(i) "Commission" means the Wyoming water development commission;

(ii) "Sponsor" means the municipality, conservancy district, irrigation district, water district, improvement and service district, water and sewer district, watershed improvement district or joint powers board that will receive funding for one (1) or more of the projects identified in section 3 or 4 of this act;

(iii) "Water development account I" means the account created by W.S. 41–2–124(a)(i);

(iv) "Water development account II" means the account created by W.S. 41–2–124(a)(ii)

**Section 2.** *General authorization.*

(a) The commission shall contract with each sponsor identified in this act for the design, construction and operation of the project in a manner consistent with this act and to administer the contract on behalf of the state of Wyoming.

(b) Upon execution of the contract outlined in subsection (a) of this section, the sponsor may design, construct and operate the project in a manner consistent with the terms and conditions outlined in the contract.

**Section 3.** *Level III construction projects-new development.*

### [GENERAL CONDITIONS]

(a) Except as otherwise specifically provided, each Level III new development construction project identified in this section shall be subject to the following general conditions:

(i) Each sponsor shall offer security for the project loan as deemed adequate and acceptable to the attorney general;

(ii) The commission shall establish repayment schedules for project loans in accordance with the conditions prescribed in this section;

(iii) Each sponsor shall establish a sinking fund for repair and maintenance of the project as deemed appropriate by the commission;

(iv) Each sponsor shall supervise design and construction of the project and submit all requests for payment to the commission for approval;

(v) Sponsors shall not make construction funding commitments until after the commission has reviewed and approved construction budgets and construction plans;

(vi) The commission shall make payments directly to the sponsors;

(vii) The sponsor shall be responsible for operation and maintenance of the project;

(viii) The sponsor is responsible for all project expenditures in excess of the total project appropriation;

(ix) If the commission determines that any sponsor has, without good cause, abandoned completion of the project, that sponsor, in addition to being required to repay the loan, shall be obligated to immediately repay the full amount of all grant funds actually expended plus interest as established by the state auditor in an amount equal to the interest that would have accrued on the expended grant funds in the water development account from the date of expenditure;

(x) Principal and interest payments made in repayment of loans shall be deposited in water development account I;

(xi) There shall be no lease, sale, assignment or transfer of ownership of water from the project for purposes other than the designated project purpose without prior written approval of the commission and the state engineer or board of control. If such a transaction is approved, the revenues generated by the lease, sale, assignment or transfer of ownership of water from the project shall be utilized to retire principal on the project loan. After that loan is paid in full, the sponsor shall receive a proportionate share of the revenues generated by the lease, sale, assignment or transfer of ownership of water from the project equal to the percentage of the project loan and the state of Wyoming shall receive a proportionate share of the revenues generated by the lease, sale, assignment or transfer of ownership of water from the project equal to the percentage of the project grant;

(xii) There shall be no lease, sale, assignment or transfer of ownership of any project until the project loan is paid in full, and until prior written approval is obtained from the commission. If these conditions are met, the sponsor shall receive a proportionate share of the revenues generated by the lease, sale, assignment or transfer of ownership of the project equal to the percentage of the project loan and the state of Wyoming shall receive a proportionate share of the revenues generated by the lease, sale, assignment or transfer of ownership of the project equal to the percentage of the project grant. Before the sponsor may lease, sell, assign or transfer ownership of the project, the state of Wyoming shall be given a one (1) year first right

of refusal option to purchase the sponsor's interest in the project for an amount equal to the principal, interest, maintenance and replacement costs incurred by the sponsor at the date the option is exercised;

(xiii) After the project loan is paid in full, the sponsor may purchase the position of the state of Wyoming, as described in paragraphs (xi) and (xii) of this subsection, for the amount of the project grant plus the interest that would have accrued on the grant amount in the water development account from the date the project was substantially completed as defined by the commission. The interest that would have accrued on the grant amount shall be established by the state auditor;

(xiv) Any revenues generated by the state from the lease, sale, assignment or transfer of ownership of any project or project water shall be deposited in water development account I.

### [NEW DEVELOPMENT CONSTRUCTION PROJECTS]

\* \* \*

(f) *Project–Pinedale Water Supply Project:*

(i) Project sponsor: Town of Pinedale;

(ii) Project purpose: Municipal and domestic water supply;

(iii) Project description: Transmission pipelines and appurtenances necessary to make the project function in the manner intended;

(iv) Total project budget: Three million five hundred fifty dollars ($3,550,-000.00);

(v) Project loan: The state of Wyoming shall loan to the sponsor from water development account I through the commission for the design, permit procurement, project land procurement, construction engineering and construction of the project an amount not to exceed one million one hundred seventy-one thousand five hundred dollars ($1,171,500.00) or thirty-three percent (33%) of the actual

development costs, whichever is less, for a term of twenty (20) years from the date the commission determines project benefits accrue to the sponsor, unless the sponsor commits to install water meters in which case the term of the loan shall be thirty (30) years, at an annual rate of four percent (4%);

(vi) Project grant: The state of Wyoming shall grant to the Sponsor from water development account I through the commission for the design, permit procurement, project land procurement, construction engineering and construction of the project an amount not to exceed two million three hundred seventy-eight thousand five hundred dollars ($2,378,-500.00) or sixty-seven percent (67%) of the actual development costs, whichever is less;

(vii) Appropriation: There is appropriated from water development account I to the commission three million five hundred fifty thousand dollars ($3,550,000.00) or as much thereof as is necessary to carry out the purpose of this subsection. Unexpended funds appropriated under this subsection shall revert to water development account I on July 1, 1999.
\* \* \*.

**Section 23.** This act is effective immediately upon completion of all act necessary for a bill to become law as provided by Article 4, Section 8 of the Wyoming Constitution.

Approved March 18, 1996.