2004 WY 17

Reno BROWN, Appellant (Plaintiff),

v.

William B. JOHNSTON, Michael A. Reisbeck, and Horse Creek Properties, Inc., Appellees (Defendants).

No. 03–71.

Supreme Court of Wyoming.

March 3, 2004.

Representing Appellant:  David G. Lewis, Jackson, Wyoming.

Representing Appellee:  James K. Lubing of James K. Lubing Law Office, Jackson, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Lessor filed suit seeking a declaratory judgment that lessees violated the lease, termination of the lease, and ejection of lessees from the leased property. Lessees counterclaimed alleging breach of good faith and fair dealing, breach of covenant of quiet enjoyment, and breach of contract. After a trial, the district court declared lessees did not materially breach the lease agreement, denied lessor's claim for ejectment, found for lessees on their claim for breach of the covenant of quiet enjoyment and awarded lessees nominal damages. Lessor appeals from the district court's judgment. We affirm.

## ISSUES

[¶ 2] Both parties raise the following issues:

I. Whether, as a matter of law, [Lessees are] exempted from the provisions of a right-of-way easement passing through the leasehold, entitling them to park the vehicles of their restaurant and bar customers on the right-of-way easement;

II. Whether the trial court's finding that [Lessees] did not materially breach any provisions of the lease agreement was inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence, and contrary to the law of Wyoming; and

III. Whether the trial court's findings on the counterclaim that [Lessees] suffered nominal damages for violation of their covenant of quiet enjoyment was inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence, and contrary to the law of Wyoming.

## FACTS

[¶ 3] This case involves a tract of land located south of Jackson, Wyoming. In 1972, the owner of the land, William Lineberry, established two businesses housed in separate buildings on the land, Bill's Open Pit Barbeque and Steak House and, next door, a tourist attraction named Teton Mystery. In 1989, following concerns over the use of Horse Creek Road, which runs along the southern boundary of the property, Mr. Lineberry filed suit against his neighbors to the east seeking to establish an easement and cause his neighbors to pay for their use of the portion of the road.[1] To resolve the litigation, Mr. Lineberry and his neighbors entered into a stipulation, which created a 16-foot right-of-way easement along the southernmost boundary of the Lineberry property. In March of 1990, the district court entered an order establishing an easement pursuant to the parties' stipulation. The stipulation provided that Mr. Lineberry's neighbors could use the easement solely for ingress and egress to their land, established a 15-mile per hour speed limit, and stated that it was granted "on the express condition that it shall be utilized in conformity with past uses." According to Mr. Lineberry, past uses included allowing customers of the restaurant to park along the southern edge of the easement.

[¶ 4] Shortly after creation of the easement, Mr. Lineberry sold his restaurant business and building to William B. Johnston, Michael A. Reisbeck and Horse Creek Properties, Inc. (collectively referred to as Mr. Johnston). Mr. Lineberry retained ownership of the Teton Mystery business, the building in which it operated, and the land upon which it was located. Mr. Lineberry also retained ownership of the land on which the restaurant was located, but entered into a fifteen year lease with Mr. Johnston for that portion of the land underneath and adjacent to the restaurant building, including land burdened by the right-of-way easement. Because Mr. Lineberry continued to own Teton Mystery, the sales contract provided that he and Mr. Johnston would share the parking area for their respective businesses, cooperate with each other in regard to it, refrain from interfering with the other's business and jointly main-

---

1. The term "road" is used loosely in the context of the portion of Horse Creek Road that runs along the Lineberry property. The site in question is a large gravel area having the appearance of a parking area rather than a road. However, neighboring landowners to the east use it to access their property to the east.

tain the common parking area. Mr. Johnston changed the name of the restaurant to Horse Creek Station and operated it according to the lease with Mr. Lineberry until 1997. Under Mr. Johnston's ownership, restaurant customers continued to park on the southern edge of the easement along the fence, as they did when Mr. Lineberry operated the restaurant, without complaint from Mr. Lineberry.

[¶ 5] In 1997, Mr. Lineberry sold the land upon which the restaurant and Teton Mystery were located to Reno Brown. Under the contract establishing the terms of the sale, Mr. Lineberry assigned Mr. Brown his interest in the lease agreement between himself and Mr. Johnston. Following the purchase, Mr. Brown and Mr. Johnston entered into an agreement modifying the original lease agreement. Among other provisions, the modification included a paragraph prohibiting Mr. Johnston from engaging in activities constituting a nuisance or disturbing the quiet enjoyment of others. Together, the original lease agreement and the modification provided the terms and conditions for the lease between Mr. Brown and Mr. Johnston. Pursuant to those terms, the shared parking arrangement that existed previously was to continue in effect, meaning Mr. Johnston and his customers could park in the leased and unleased parking areas, including the area next to Teton Mystery belonging to Mr. Brown, and Mr. Brown could park on the leased portion in front of the restaurant.

[¶ 6] After purchasing the property, Mr. Brown became concerned about the easement owners' and Mr. Johnston's use of the shared parking area and easement. Specifically, he complained the easement owners were not obeying the 15 mph speed limit on Horse Creek Road and Mr. Johnston's customers were parking along the road on the south side of the easement. In an attempt to slow down speeding vehicles, Mr. Brown dug a speed dip across the portion of the easement adjacent to Teton Mystery. This caused easement users to drive off the easement and through the shared parking area to

avoid the speed dip. Mr. Brown then placed two railroad ties along the north boundary of the easement in an attempt to prevent cars from leaving the easement to avoid the speed dip. One of the easement owners was allegedly injured when he tried to move one of the ties and sent Mr. Brown a letter threatening legal action for the injury and interference with the easement and demanding that Mr. Brown remove the obstructions and repair the roadway.[2] Also in the letter, the easement owner complained about restaurant customers "continuously parking in the limited available right-of-way thereby requiring people to drive off the right-of-way through private property" in order to access their property. As a result, Mr. Brown sent a letter to Mr. Johnston demanding that he instruct his customers not to park their cars in a manner that obstructed the easement. Mr. Brown also sent a letter to the easement owner advising him that the speed bump would remain in place to encourage traffic to slow down.

[¶ 7] Shortly after this exchange of correspondence, Mr. Brown met with Mr. Johnston to discuss a number of problems related to the lease agreement. By letter dated June 15, 1999, addressed to Mr. Johnston, Mr. Brown memorialized what was discussed at the meeting. The letter does not mention the problems associated with the easement. However, by letter dated June 16, 1999, Mr. Brown again advised Mr. Johnston that parking could not continue on the easement. Apparently customers continued to park on the easement and Mr. Brown wrote Mr. Johnston another letter on July 9, 1999, expressing his concerns about the parking situation, notifying Mr. Johnston that he was in default on the lease, and advising him the lease would be terminated in thirty days if he did not correct the situation.

[¶ 8] Meanwhile, in addition to the parking issue, another problem between the parties was developing. The agreement provided that Mr. Johnston would pay all taxes due on the restaurant "as they become due and

---

2. The easement owner ultimately sued Mr. Brown. He alleged in his complaint that the speed dip constructed by Mr. Brown was too deep for his car to safely traverse, and he was attempting to move the railroad tie so that he could drive through the parking area to avoid the dip when he was injured.

before they become delinquent." Mr. Brown apparently received the tax notice for all of the property, including the restaurant. In December of 1998, Mr. Brown paid all of the 1998 taxes and then, in January of 1999, wrote a letter to Mr. Johnston requesting reimbursement for his share of the taxes. In June of 1999, claiming that Mr. Johnston did not reimburse him for his share of the 1998 taxes until a month after his January request, Mr. Brown asked Mr. Johnston to pay his share of the 1999 property taxes in advance. The following year, Mr. Johnston apparently requested advance notice of the amount of his portion of the taxes and so, by letter dated September 11, 2000, Mr. Brown advised Mr. Johnston of the amount and requested payment by December 31, 2000. Mr. Johnston did not pay Mr. Brown for his portion of the 2000 property taxes until January 2, 2001, but offered to pay interest on the late payment. Mr. Johnston's check, however, was issued to the Teton County Treasurer, not Mr. Brown, causing Mr. Brown to return the check to Mr. Johnston. Despite the delays, Mr. Brown received payment for the 2000 property taxes within thirty days, in compliance with the default provision of the lease.

[¶ 9] In April of 2000, another dispute arose between Mr. Brown and Mr. Johnston. Both the original lease agreement and the modification provided for a cost of living rental increase in accordance with the Consumer Price Index effective every five years during the lease term. The first such increase during Mr. Brown's ownership was to be paid in April of 2000. The agreement also provided that rent was to be paid in equal monthly installments on the first day of each month with a seven-day grace period. If Mr. Johnston failed to pay the rent within the seven-day period, he would be assessed a late charge of 10% of each delinquent payment. Additionally, if Mr. Johnston failed to pay the rent when due, Mr. Brown could terminate the lease if Mr. Johnston did not cure the default within 30 days after receiving notice from Mr. Brown of his failure to pay.

[¶ 10] On April 1, 2000, Mr. Johnston failed to add the cost of living adjustment to his rental payment, and instead issued a check to Mr. Brown in the amount of the previous month's rent. Mr. Brown accepted that check and continued to accept and cash Mr. Johnston's checks without the additional cost of living adjustment through September 2000. After receiving September's rent, Mr. Brown sent Mr. Johnston a certified letter notifying him that he owed additional rent pursuant to the cost of living adjustment provision in the lease. Mr. Johnston continued to send rent payments without the cost of living adjustment through January of 2001. Mr. Brown accepted all but the January check, which he returned to Mr. Johnston.

[¶ 11] By certified letter dated January 3, 2001, Mr. Brown advised Mr. Johnston that he considered him to be in default of the lease because, among other issues not raised on appeal, he failed to timely pay his share of the property taxes in accordance with the terms of the lease, continued to allow customer parking on the easement contrary to Mr. Brown's demands, and failed to pay cost of living rental increases in compliance with the lease. Within thirty days of receiving the letter, Mr. Johnston issued a check to Mr. Brown for the cost of living adjustment for all months since April 2000, which Mr. Brown refused to accept.

[¶ 12] In February 2001, Mr. Brown filed a declaratory judgment action seeking a declaration that Mr. Johnston was in violation of the lease agreement. Mr. Brown alleged Mr. Johnston breached the sales contract and lease agreement by: (1) allowing customers to park along the easement in violation of the quiet enjoyment, nuisance, public policy and trespass provisions of the agreements; (2) failing to pay cost of living rental increases as required by the lease; and (3) failing to pay the 2000 property taxes before December 31. Mr. Brown asked that Mr. Johnston be ejected from the property. Mr. Johnston counterclaimed, alleging that Mr. Brown had violated the covenant of good faith and fair dealing and the covenant of quiet enjoyment provision of the contract.

[¶ 13] During the pendency of that litigation, in July 2001, Mr. Brown placed concrete barriers along the southern edge of the parking area in an attempt to delineate the line

between the easement and the parking area and keep vehicular traffic on the easement. In response, Mr. Johnston filed a motion for temporary restraining order and preliminary injunction against Mr. Brown, alleging the concrete barriers interfered with the restaurant business in violation of the lease agreement. After a hearing, the district court denied the motion and assigned the dispute to mediation. The parties were unsuccessful in resolving their differences through mediation and the matter was set for trial.

[¶ 14] After a two day bench trial, the district court found Mr. Johnston had not materially violated the lease agreement, Mr. Brown had failed to follow the provisions in the lease for notice and opportunity to cure any alleged breaches, Mr. Brown, by his conduct, waived any alleged breaches, and Mr. Brown breached the covenant of quiet enjoyment by placing the concrete barricades in the parking lot. Accordingly, the district court denied Mr. Brown's request for Mr. Johnston's ejectment from the property, and awarded Mr. Johnston nominal damages in the amount of $250. Mr. Brown appeals from the district court's findings of fact and conclusions of law.

## STANDARD OF REVIEW

[¶ 15] Our review of the district courts findings is governed by the following standards:

We review the trial court's conclusions of law *de novo*. The trial court's findings of fact are subject to the clearly erroneous standard:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed.

Also, in reviewing a trial court's findings of fact, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

We affirm the trial court's findings if there is any evidence to support them. *Life Care Centers of America, Inc. v. Dexter*, 2003 WY 38, ¶ 7, 65 P.3d 385, ¶ 7 (Wyo.2003) (citations omitted). Because this Court does not weigh the evidence *de novo*, we may not set aside a finding merely because we might have reached a different result. *Pagel v. Franscell*, 2002 WY 169, ¶ 7, 57 P.3d 1226, ¶ 7.

## DISCUSSION

[¶ 16] On appeal, Mr. Brown raises three issues. First, he takes issue with the district court's conclusion that Mr. Johnston was not subject to the easement running across the leased property and was thus entitled to allow his customers to park on the easement. Second, he contends the district court erred in finding that Mr. Johnston did not materially breach the lease agreement, that Mr. Brown waived any such breach, and that he failed to follow the lease provisions for notice of default. Third, he contends the district court erred by awarding Mr. Johnston nominal damages for his breach of the covenant of quiet enjoyment.

*District Court's Findings that Mr. Johnston Was Not Subject to the Easement and Mr. Brown Could Not Litigate Easement Issues*

[¶ 17] Mr. Brown's first assignment of error relates to the following finding of the district court:

6. The Court finds that the original lease agreement signed by defendants with plaintiff's predecessors, and the Modification of Lease Agreement signed by

the parties ... as well as the Order Establishing Easement ... do not restrict the defendants' use of the leased premises for vehicular access, and the defendants are not subject to the restrictions of the road easement which pertains to other persons in addition to plaintiff, who are not parties to this lawsuit. The persons for whom the easement was created are not parties to this case. Plaintiff is the owner of the servient estate under the easement and it is improper for plaintiff to seek to litigate easement issues against these defendants under the circumstances of this case.

Mr. Brown contends the district court erred in concluding first that Mr. Johnston was not subject to the easement, and second that he could not litigate easement issues against Mr. Johnston.

[¶ 18] Citing Wyo. Stat. Ann. § 34–1–121(a) (LexisNexis 2003), Mr. Brown argues that Mr. Johnston's lease was subject to the easement just as other interests in land are subject to previously recorded instruments touching upon interests in lands.[3] Mr. Brown further argues that the characterization of his interest in the easement portion of the leased property as a servient estate was relevant only to the extent that matters pertaining to the southerly sixteen feet of the property were at issue. Because this dispute involved interference by Mr. Johnston with his quiet enjoyment of the unleased portion of the property over which he retained ownership and the shared parking area, he argues the district court incorrectly found he could not litigate those claims against Mr. Johnston.

[¶ 19] We agree that Mr. Johnston's lease was subject to the easement in the sense that the land he leased was burdened by the pre-existing easement, preventing him from putting the southerly sixteen feet of the property to a use inconsistent with the easement. However, we are not convinced the district court found otherwise. Reading the finding

in paragraph 6 of the order in the context of the record as a whole, it appears to this Court that the thrust of the district court's finding was that nothing in the sale, lease or easement documents prohibited Mr. Johnston's use of the leased premises, including the easement, for parking and any claim that the easement was violated by such use was between the parties to the easement, i.e., Mr. Brown, as successor in interest to Mr. Lineberry, and the landowners to the east for whose benefit the easement was granted, not Mr. Johnston. Regardless of what the district court meant by the finding, it is clear Mr. Johnston's interest in the restaurant as buyer and the real property as lessee was subject to the pre-existing, recorded easement. *Mueller v. Hoblyn*, 887 P.2d 500, 505 (Wyo.1994). *See also Restatement (Third) of Property* § 5.2 (1977).

[¶ 20] Somewhat more complicated is Mr. Brown's claim that the district court erred in finding he could not litigate matters pertaining to the easement in an action against Mr. Johnston. The record is clear that Mr. Brown brought claims against Mr. Johnston for breach of the sale and lease documents, not for violation of the easement. However, in his motion to dismiss, Mr. Johnston raised the question of whether Mr. Brown was the proper party to bring an action to enforce the easement. Mr. Johnston raised the issue again in a trial brief and renewed his motion to dismiss through counsel during opening statements. As reflected in paragraph 6 of the order quoted above, the district court ruled on the motion after the trial when it found Mr. Brown, as owner of the servient estate under the easement, could not properly litigate easement issues against Mr. Johnston under the circumstances of this case. Implicit in the district court's findings is the conclusion that the easement owners, the neighbors to the east of the leased property, were proper parties to litigation concerning the easement. Mr. Brown appeals that finding, arguing first that parking cars

---

**3.** § 34–1–121(a) provides in pertinent part: "(a) Each and every deed, mortgage, instrument or conveyance touching any interest in lands, made and recorded, according to the provisions of this chapter, shall be notice to and take precedence of any subsequent purchaser or purchasers from the time of the delivery of any instrument at the office of the register of deeds (county clerk), for record."

on the easement interferes with use of the easement by the owners and then arguing that the district court's finding was erroneous because rather than seeking to enforce the easement, Mr. Brown sought enforcement of the terms of the lease. But for Mr. Brown's appeal of the district court finding in paragraph 6 of the judgment, we might well have concluded it was an incidental finding not necessary to resolution of the claims stated in the complaint. With his appeal of the finding, however, Mr. Brown has placed the issue squarely before us. The manner in which he has done so, as well as his testimony at trial, makes it apparent despite his argument to the contrary that what he sought by his complaint, at least in part, was an order prohibiting parking by Mr. Johnston's customers on the easement.

[¶ 21] To the extent Mr. Brown sought enforcement of the rights of the easement owners, the district court's ruling is correct—the easement owners were the proper parties to an action to enforce their rights under the easement. If Mr. Johnston's practice of allowing his customers to park on the easement interfered with the neighboring property owners' use of the easement, they had the legal right to enforce the easement. *Restatement (Third) of Property* § 8.1 (1977). Similarly, to the extent that Mr. Brown sought a court order requiring the easement owners to obey the speed limit or prohibiting them from trespassing on his property in accessing their property, his claim lay against them and not Mr. Johnston. Finally, to the extent Mr. Brown sought a court order requiring Mr. Johnston to refrain from allowing his customers to park on the easement because parking on the easement was causing the easement owners to trespass on his property, Mr. Brown's claim lay against Mr. Johnston for violation of the lease. Because the first two of these potential claims involve the easement owners who are not parties to this action, we are left to resolve only the question of whether Mr. Johnston's action in allowing customers to park on the easement violated his lease with Mr. Brown.

### Breach of Lease Agreement

[¶ 22] Mr. Brown contended that Mr. Johnston breached the lease agreement by (1) allowing patrons to park on the easement, (2) failing to pay the cost of living rental increases, and (3) failing to timely pay the property taxes for the year 2000.

[¶ 23] Contract law governs the construction and interpretation of a lease. *Pavuk v. Rogers*, 2001 WY 75, 30 P.3d 19 (Wyo.2001). A lease is to be construed as a whole, with the objective to find reasonable construction which, if possible, does not render any provision meaningless. *Brazelton v. Jackson Drug Co., Inc.*, 796 P.2d 808, 810 (Wyo.1990). We resolve any doubts as to the meaning of a lease against the drafting party, in this case Mr. Brown. *Id.* If the lease terms are ambiguous, we may consider extrinsic evidence to determine the intent of the parties. *Wadi Petroleum, Inc. v. Ultra Resources, Inc.*, 2003 WY 41, 65 P.3d 703 (Wyo.2003).

### 1. Parking on the easement

[¶ 24] In claiming that parking on the easement violated the lease modification agreement, Mr. Brown points to the following provision: "The Tenant shall not commit, or suffer to be committed, any nuisance or other act or thing against public policy, or which may disturb the quiet enjoyment of any person." He claims the parking along the easement created a nuisance and interfered with his quiet enjoyment of the unleased portion of his property and the shared parking area in that it obstructed the easement and caused the easement owners to trespass on his property.

[¶ 25] We interpret express covenants according to the obvious intention of the parties, in consonance with the reasonable sense of the words employed, and we will not extend express covenants by interpretation unless their implication is clear and undoubted. *Fuchs v. Goe*, 62 Wyo. 134, 163 P.2d 783, 793 (1945). Additionally, in determining the parties' intention as gleaned from the language, we look to the lease as a whole, keeping in mind the situation of the parties when the lease was made, its subject matter,

and purpose of its execution. *Bornel, Inc. v. City Products Corp.*, 432 P.2d 489, 492 (Wyo. 1967). We have defined nuisance as "a class of wrongs which arise from an unreasonable, unwarranted, or unlawful use by a person of his own property, working an obstruction or injury to the right of another." *Edgcomb v. Lower Valley Power and Light, Inc.*, 922 P.2d 850, 859 (Wyo.1996). Applying the definition in *Edgcomb*, we held that where the scope of an easement was not exceeded and the uses to which it was put were not unreasonable, unwarranted or unlawful, they did not constitute a nuisance.

[¶ 26] The unambiguous language in the stipulation creating the easement in this case stated that it was to be used in conformity with past uses. The undisputed evidence showed that parking was allowed on the easement prior to and continuously after the easement was granted. There was no showing that the manner or extent of parking along the easement by Mr. Johnston's patrons changed in any significant way after Mr. Brown purchased the property. Given these facts, the trial court would have been hard pressed to conclude that use of the southern edge of the easement for parking was unreasonable, unwarranted or unlawful so as to constitute a nuisance in violation of the lease. We hold that the trial court's ruling with respect to the nuisance provision of the agreement was not clearly erroneous.

[¶ 27] Black's Law Dictionary defines "quiet enjoyment" as, "the possession of real property with the assurance that the possession will not be disturbed by a superior title." *Black's Law Dictionary* 550 (7th ed.1999). In this case, given the language of the modified lease agreement expressly imposing on the tenant the obligation to refrain from acts disturbing the quiet enjoyment of others, Mr. Johnston was prohibited from engaging in acts that disturbed Mr. Brown's possession of his property. The evidence presented at trial showed that since the inception of the restaurant, prior to the creation of the easement, restaurant patrons were allowed to park along the southern edge of Horse Creek Road. Mr. Lineberry allowed his restaurant patrons to park along the fence next to the road, and after Mr. Lineberry sold the res-

taurant to Mr. Johnston, restaurant customers continued to park along the road without complaint from Mr. Lineberry. The easement was granted with the express condition that it be used in conformity with existing uses. Parking along the easement was an existing use. Thus, from the beginning, those using the easement to access their property did so subject to the condition that restaurant customers would park along the southern edge of the easement.

[¶ 28] When Mr. Brown purchased the property from Mr. Lineberry, he stepped into Mr. Lineberry's shoes. He purchased the property subject to the existing lease with Mr. Johnston and burdened by the existing easement containing the language that it was subject to past uses. Mr. Brown acknowledged that customers had been parking along the easement for thirty years.

[¶ 29] The easement owners did not complain about cars parked on the easement until Mr. Brown sought first to slow traffic down by constructing the speed dip and then, when the speed dip only caused traffic to drive through the shared parking area, by placing railroad ties between it and the parking area. In fact, two of the easement owners testified at trial that Mr. Johnston was a good neighbor and they were content with permitting Mr. Johnston to allow his customers to park along the easement. From the evidence presented, a court might reasonably conclude that the problem of easement owners trespassing on Mr. Brown's property resulted not from any actions by Mr. Johnston, but from Mr. Brown's efforts to slow traffic on the easement by constructing a speed dip. In any event, from our review of the record we conclude the district court's factual determinations with respect to the parking issue were supported by the evidence and were not, therefore, clearly erroneous. Consequently, the district court's holding that parking on the easement caused no violation of the terms of the lease was proper.

## 2. Cost of living increase

[¶ 30] Mr. Brown asserts the district court erred in finding that Mr. Johnston did not materially breach the lease agreement by failing to pay the cost of living

rental increase. On April 1, 2000, when Mr. Johnston failed to add the cost of living adjustment to his rental payment and instead issued a check to Mr. Brown for the original amount, Mr. Brown accepted the payment. Mr. Brown continued to accept and cash Mr. Johnston's checks without the additional cost of living adjustment through September of 2000. Although Mr. Brown sent Mr. Johnston a certified letter after receiving September's rent, notifying him that he was in default for failing to pay the cost of living increase, Mr. Johnston continued to send, and Mr. Brown continued to accept, payments without the cost of living adjustment until January of 2001.

[¶ 31] The district court found that Mr. Johnston did not violate the terms of the lease in any material fashion and that Mr. Brown failed to comply with the default provisions requiring notice and an opportunity to cure. Having reviewed all of the properly admitted evidence contained in the record, we hold that the trial court's finding is not clearly erroneous. Although the lease required Mr. Johnston to pay the additional amount on or before April 1, 2000, Mr. Brown accepted the previous amount in payment of the rent for the months of April, May, June, July, August and September of 2000. After notifying Mr. Johnston that the rental payments for the previous six months were deficient and that he was in default, Mr. Brown continued to accept payments without the cost of living increase for another four months. It was not until January 2001, nine months later, that Mr. Brown refused payment and again notified Mr. Johnston the payments were deficient and that he was in default.

[¶ 32] Mr. Johnston failed to pay Mr. Brown $40 per month from April 2000 until January 2001. This amounts to a total deficiency of $360. After receiving the January 2001 notice of default, Mr. Johnston paid that amount in full within 30 days. The deficiency was cured before Mr. Brown filed his complaint in this matter. Forfeiture is harsh and equity disfavors forfeiture for a delayed payment of rent. 49 Am.Jur.2d *Landlord and Tenant* § 290; see also *Angus Hunt Ranch, Inc. v. REB, Inc.*, 577 P.2d 645,

650 (Wyo.1978). In *Baker v. Jones*, 69 Wyo. 314, 240 P.2d 1165 (1952), this Court said:

It is now well established in law and in equity that forfeitures are not favored. Before one can declare a forfeiture it must appear that he has a clear right and then too he himself must be free from blame in the premises. Every reasonable presumption is against a forfeiture and every intendment and presumption is against a person seeking to enforce it. 17 C.J.S., *Contracts*, 407, page 896. Provisions for forfeiture may be waived and the courts are quick to take advantage of circumstances indicating such an intention. 17 C.J.S. 897, 409.

*Id.* at 1171. Under the present circumstances, Mr. Johnston's late payment of $360 four months after the first notice of default does not justify forfeiture of a long-term lease. Giving every reasonable presumption against forfeiture and the party seeking forfeiture, we are not left with the definite and firm conviction that the district court was mistaken in its finding. A lessor waives his cause for forfeiture if he condones or assents to previous defaults and has not given notice of his intention to insist on strict compliance in the future. *Angus Hunt Ranch, Inc.*, 577 P.2d at 650. By accepting rental payments that did not include the cost of living increase from April 2000 until September 2000, Mr. Brown waived his right to claim Mr. Johnston was in default. Although Mr. Brown sent Mr. Johnston a certified letter in September 2000, notifying Mr. Johnston that he was in default for failure to pay cost of living increases, he continued to accept Mr. Johnston's errant rental payments for the months of October, November and December of 2000. We hold the record adequately supports the district court's conclusion that Mr. Johnston's failure to pay the cost of living adjustment was not a material violation of the lease under the circumstances and that Mr. Brown by his conduct waived any breach.

### 3. Property taxes

[¶ 33] Mr. Brown argues the trial court erred in finding Mr. Johnston did not materially breach the lease agreement by failing to timely pay property taxes for the

year 2000. While Mr. Johnston failed to pay the taxes by December 31, 2000, as Mr. Brown requested, he did deliver Mr. Brown a check for the property taxes on January 2, 2001. This check was mistakenly issued to the Teton County Treasurer. Consequently, on January 3, 2001, Mr. Brown returned Mr. Johnston's check, and requested that he make the check out to him. He notified Mr. Johnston that he was in default for failure to pay the taxes on time, and gave him 30 days in which to cure the default. At trial, Mr. Brown testified that Mr. Johnston issued a check to him for the property taxes within the 30 day period; therefore, Mr. Johnston properly cured any default of the lease agreement for failure to pay taxes. We hold the district court's finding on this issue was not clearly erroneous.

### Award of Nominal Damages

[¶ 34] Mr. Brown also claims error in the award of nominal damages to Mr. Johnston on his counterclaim. The district court found that Mr. Browns act of erecting or placing concrete barricades on the leased premises was a breach of the covenant of quiet enjoyment of the leased premises, and awarded Mr. Johnston $250.00 for nominal damages. As with the other claims, we hold the district courts award of nominal damages to Mr. Johnston was not clearly erroneous.

[¶ 35] The lease modification agreement provided that: Tenants are entitled to the quiet enjoyment of their own dwelling, and their neighbors are entitled to the same. Mr. Johnston was entitled to rely upon the covenant of quiet enjoyment to protect him from any interference with his right of possession granted by the lease. *Diamond Cattle Co. v. Clark,* 52 Wyo. 265, 74 P.2d 857, 866 (1937). Mr. Johnstons right of possession was for use of the leased premises for a restaurant and liquor store, and use of a shared parking area. The evidence shows that Mr. Brown placed concrete barriers in the leased area for the purpose of defining the northern boundary of the easement, and later stored the barriers in the shared parking lot. It is clear that Mr. Browns actions interfered with Mr. Johnstons business. The barriers made it difficult for delivery trucks

to make deliveries to the restaurant and took up available parking used by the restaurants patrons. The district courts finding that by placing concrete barriers on the leased premises Mr. Brown breached the covenant of quiet enjoyment was not clearly erroneous.

[¶ 36] At trial, although Mr. Johnston did not prove that Mr. Browns breach caused any amount of loss or damage, the district court awarded Mr. Johnston nominal damages in the amount of $250. Nominal damages can be awarded where a cause of action for a legal wrong is established even though there is no proof of actual damages. *State ex rel. Willis v. Larson,* 539 P.2d 352, 355 (Wyo.1975); see also, 25 C.J.S. *Damages* 19 (2002). Nominal damages are a mere token signifying that a claimants rights where technically invaded even though he could not prove any loss or damage. *Griffith v. State of Colorado, Division of Youth Services,* 17 F.3d 1323, 1327 (10th Cir.1994). Accordingly, we hold that the district court did not err in awarding nominal damages to Mr. Johnston in the token amount of $250 for Mr. Browns breach of the covenant of quiet enjoyment.

[¶ 37] The judgment of the district court is affirmed.