2005 WY 87

**Anthony MEIMA, an Individual, Appellant (Plaintiff),**

v.

**Thomas C. BROEMMEL, as Trustee of the Northern Commercial Trust dated July 24, 2001; and Thomas Broemmel, Individually, Appellees (Defendants).**

No. 04-159.

Supreme Court of Wyoming.

Aug. 5, 2005.

---

John M. Kuker and Matthew H. Romsa of Romsa & Kuker, LLC, Cheyenne, Wyoming, for Appellant.

Michael E. Warren of Sawyer & Warren, P.C., Torrington, Wyoming, for Appellees.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] The appellant, Anthony Meima (Meima), met the appellee, Thomas C. Broemmel (Broemmel), in 2001. The two subsequently discussed several business propositions, including Broemmel's involvement in financing Meima's purchase of a house in Torrington and Broemmel's investment in Meima's real property in California (also known as the Baltic properties). The parties executed numerous documents in that regard; however, their business relationship deteriorated and a lawsuit was filed. Following a bench trial, the district court essentially entered a judgment in favor of Broemmel. Meima appeals from the district court's judgment and claims that the district court erred in several respects. We will affirm.

## ISSUES

[¶ 2] We find that the dispositive issues in the instant case are as follows:

1. Meima testified that he had been "involved in real estate a long time" and was "profitable" in a venture for twenty to twenty-five years that marketed property and reinvested the profits in residential rentals. Yet, according to Meima, the "biggest deal I have done [was] still under a billion [dollars]."

1. Whether the district court erred in finding insufficient intent to create an express trust regarding the Torrington house, and whether we should address Meima's issue concerning the imposition of a constructive trust on the Torrington house and/or the Baltic properties?

2. Whether the district court erred in finding that an oral contact between the parties did not exist prior to July 24, 2001?

3. Whether the district court erred in rejecting Meima's claims that the July 24, 2001, lease/purchase agreement was invalid due to a lack of consideration, economic duress, undue influence, or unconscionability of terms?

4. Whether the district court's judgment directly affected the title to the Baltic properties?

5. Whether the district court erred in other aspects of its judgment?

## FACTS

[¶ 3] Meima, a self-described real estate investor,[1] was searching for a new residence following a divorce in which his wife received or "wasted," according to Meima, up to fifteen residential properties valued at over $2 million. He was admittedly "quite sensitive to losing houses" following the divorce and most recently had bought a house in Colorado with a girlfriend. The girlfriend obtained the loan to buy the house, the house was titled in her name, and Meima contributed $25,000.00 to $30,000.00 in equity money towards the purchase. When the relationship ended, Meima lost his equity money and needed to find another residence. He ultimately searched for a residence in Wyoming because of the moderate pricing relative to the quality of the housing, and because it "was a good market to buy."

[¶ 4] Meima and Broemmel met at a Denver gun show in early 2001.[2] The two proceeded to discuss Broemmel's role in poten-

2. Meima testified that it was "around the first of February," and Broemmel testified that it was the "first part of 2001 . . . ."

tially financing Meima's purchase of a house in Torrington and other business propositions. They ultimately executed several documents in this regard. We will set forth the pertinent contents of these documents and detail each party's trial testimony regarding the progression of their business relationship, the documents at issue, and their disputes. We will then summarize the district court's resolution of the resulting litigation.

***The Documents***

[¶ 5] On February 20, 2001, Meima signed a contract to buy real estate located in Torrington. The document named the Northern Commercial Trust [3] as the buyer, provided that title to the house would be conveyed to the "Northern Commercial Trust," offered a purchase price of $186,000.00 (a $1,000.00 cashier's check purchased by "Anthony Meima" had been remitted as earnest money), indicated that the offer was "contingent upon loan approval" with financing to be "Other," and set a June 16, 2001, closing date. On February 21, 2001, the seller submitted a counter-offer to Meima that increased the purchase price to $198,000.00 and the total earnest money to $5,000.00, required the buyer to provide a "satisfactory letter of prequalification from [a] lender by March 30, 2001," and set a mandatory closing date of June 11, 2001 (or the buyer would forfeit the earnest money). The buyer subsequently agreed to the increased purchase price and earnest money (another $4,000.00 cashier's check had been remitted by "Anthony Meima" on April 10, 2001) and to provide "a cash sale commitment or lender prequalification letter on April 15, 2001."

[¶ 6] On April 29, 2001, Meima signed (and Broemmel signed as a "Witness") an addendum to the house purchase contract stating that all "financing contingencies shall be removed," "Buyer and Seller shall proceed with dates set for closing," and "Buyer agrees to the disclosure of the attached financial statement to the Seller." The at-

tached financial statement was the "Personal Financial Statement" of Broemmel and his wife, Lani K. Lee. The seller apparently agreed to the addendum on May 7, 2001.

[¶ 7] On May 25, 2001, a Real Estate Purchase Option was executed between David A. Kubich,[4] as seller, and "Tom C. Broemmel or Assigns," as buyer, which option was recorded June 11, 2002. The option granted Broemmel the exclusive right to purchase the "Baltic–Birchville Properties" (including specified mineral interests and "all rights and interests acquired from Meima" in these properties, situate in California) (hereinafter "the Baltic properties") for $140,000.00 if Broemmel exercised the option prior to November 25, 2002. Meima had purchased the Baltic properties, "mountain property" north of Lake Tahoe, in 1979 for $800,000.00.

[¶ 8] On June 11, 2001, Meima signed another addendum to the house purchase contract that extended the closing date to "on or before August 9, 2001," required Meima to submit an additional $10,000.00 in earnest money by June 12, 2001, and obligated Meima to pay eight percent interest on the balance of the purchase price until the closing date. The seller signed the addendum on June 12, 2001, and a cashier's check for $10,000.00 was issued on June 12, 2001, listing the purchaser as "[A]nthony [M]eima."

[¶ 9] Meima and Broemmel then executed a July 24, 2001, "Terms of Lease/Purchase Agreement" that included the following terms:

(a) Broemmel will pay $185,817.91 to finance the balance of the Torrington house purchase price for "Anthony Meima." Broemmel will "hold [the] property in trust for Meima on a lease/purchase for a price determined by all costs and expenses incurred by Broemmel to acquire that property and under" the other conditions set forth in the agreement.

---

**3.** Meima was the settlor of a Northern Commercial Trust by virtue of a written document executed in March 1998. However, on appeal the parties agree that this particular trust is not the trust referred to in subsequent documents.

**4.** Mr. Kubich signed the option on May 29, 2001, and Patricia Kubich signed the option on July 19, 2001.

(b) Meima will pay a monthly "lease payment" of $2,000.00, which payments will not be applied to offset the amount Broemmel contributed to the house's purchase price. If the "full home loan" is not paid in full within one year, the monthly lease payments will increase to $2,500.00.

(c) Meima will pay all "taxes, insurance, assessments and all costs and expenses incurred by Broemmel associated" with the house.

(d) Meima will provide Broemmel the Celina Flat Mine property "free and clear of encumbrances" as "additional collateral...." The property is "valued at $70,000" and if Meima "defaults in monthly payments for 2 months, Broemmel may sell original property and 'X' property to recover all costs and expenses incurred by Broemmel." "[T]his property reverts back to Meima" when Broemmel is paid "all moneys due him...."

(e) Meima will also provide to Broemmel a collection of Mauser rifles "at a cost of $16,500.00. If Meima defaults in monthly payments for 2 months, Meima relinquishes all equity in Mauser rifles[.]"

(f) Meima will pay Broemmel a $10,000.00 profit in addition to the "lease payments" for financing the house. The $10,000.00 profit may be paid from the "profit" on the Baltic properties or from stock options related to the Baltic properties.[5] Meima will also provide Broemmel a new 98K Mauser Rifle as "partial payment for financing this house."

(g) Meima "grants" Broemmel, "as trustee, total control of the Baltic properties to sell or do [whatever] is necessary to recover any losses incurred as a result of the purchase of said property." Broemmel will remain as "trustee" for "2 years or as long as Broemmel has not been paid off for the purchase of Meima's home."

(h) "It is further agreed ... that when the Baltic properties are sold, [Broemmel] will receive 20% of the profit and 50% of any stock options received as a result of the sale."

"Tom Broemmel" signed the agreement as "Owner," and "Anthony Meima" signed the agreement as "Buyer."

[¶ 10] The "Buyer" listed on the Torrington house closing statement dated July 24, 2001, is "Thomas Broemmel, Trustee of the Northern Commercial Trust." On July 24, 2001, the Torrington house was deeded to "THOMAS BROEMMEL, Trustee of the Northern Commercial Trust, dated the *24th* day of *July, 2001* ...."

[¶ 11] On July 25, 2001, a Promissory Note was executed between the "Borrower," "Anthony Meima," and the "Lender," "Thomas C. Broemmel and Lani K. Lee." In it, the Borrower promised to pay $185,817.91 ("with no interest") and $2,000.00 "monthly lease payments" (that will not "reduce the amount of this note") to the Lender subject to the conditions of an "Addendum to Promissory Note dated July 25, 2001 Terms of Lease/Purchase Agreement." The addendum contains many of the same terms as the July 24, 2001, lease/purchase agreement, with the following exceptions:

(a) Broemmel, "as trustee of Northern Commercial Trust, has sole authority to sell or convey said property in his own name until he is paid in full the $185,817.91 and all costs and expenses associated with this acquisition." "The Northern Commercial Trust is limited to an agreement by Tom Broemmel to hold [the Torrington house] for the benefit of Anthony Meima pending performance of all terms of this preceding lease/purchase agreement by Anthony Meima." If "Meima defaults in monthly payments for 2 months, Broemmel may sell [the Torrington house] and Celina Flat Mine properties to recover the principal, all costs and expenses incurred by Broemmel."

(b) Meima will provide Broemmel a collection of "13–98K Mauser rifles to Broemmel at a cost of $16,500.00. If Meima defaults in monthly payments for 2

---

5. At some point, Meima and Broemmel discussed an arrangement whereby Calais Resources would grant them stock options and pay all costs associated with the Baltic properties (including the costs necessary to exercise the Kubich option) and reimburse Meima for his monthly rental payments on the Torrington house. This arrangement ultimately did not come to fruition.

months, Meima relinquishes all equity in Mauser rifles." A list of the rifles was attached.

(c) When the Baltic properties are sold, "Broemmel will receive 20% of the sales price if the sales price is $500,000 or less to a maximum of $100,000[ ] and 50% of any stock options received as a result of the sale."

(d) Broemmel will allow Meima to sell the Baltic properties or the Celina Flat Mine property "provide[d] the proceeds are applied toward the retirement of the $185,817.91[.]"

[¶ 12] On July 27, 2001, "Anthony Meima" granted a specific power of attorney to Broemmel "in all matter[s] relating to the" Torrington house on behalf of him "personally and for my trust, Northern Commercial Trust...."[6] In turn, Broemmel signed an Agreement to Execute Power of Attorney on July 27, 2001, promising to execute a specific durable power of attorney for "Anthony Meima" to have "sole authority and discretion of the Baltic Properties," although Meima's authority was to cease if Meima defaulted on the promissory note dated July 25, 2001.

[¶ 13] On April 1, 2002, a Mortgage Deed With Release of Homestead was executed naming the Northern Commercial Trust dated July 24, 2002 (although it presumably meant to say 2001), as mortgagor, Thomas C. Broemmel and Lani K. Lee as the mortgagees, and the Torrington house as the mortgaged property for $185,817.91. The mortgage was signed by Thomas C. Broemmel for the Northern Commercial Trust.

[¶ 14] In June 2003, a portion of the Baltic properties was sold to Michael Sinclair for about $440,000.00. Broemmel was named as the property's seller. After accounting for costs associated with the sale, the balance of $381,603.21 was distributed as follows: $142,000.00 to Broemmel for "partial repay-ment," $30,000.00 to Meima's financial backer, $22,600.00 to Meima's trial attorney "for outstanding legal fees,"[7] and $187,003.21 to Meima's trial attorney's trust account. Eventually, by "mutual agreement," $20,000.00 was distributed to Broemmel and $15,000.00 was distributed to Meima from the trust account.

## Meima's Testimony

[¶ 15] Meima testified that he expressed his need for someone to finance the purchase of a home when he met Broemmel in 2001. Broemmel replied that he was in the process of selling a building in Denver,[8] and was indeed seeking "investment opportunities...." Meima reportedly offered Broemmel a twenty percent "net profit interest" in the Baltic properties (with Meima bearing all of the marketing expenses) as "compensation"[9] for financing the Torrington house purchase, and Broemmel said "sure, I will do that." During the next "month or so," Meima remained in "frequent" contact with Broemmel in that regard and personally met with Broemmel three to five times.

[¶ 16] Meima had considered several other financing options (a co-signer, optioning or pledging other property, or a loan through an acquaintance at a financial institution), but ultimately concluded that Broemmel was "so agreeable that there was no necessity in bringing in four or five competing offers." Meima also claimed that he was "unknown in Wyoming" and his "credit had been destroyed in the divorce," so he was "not a good lending prospect in the eyes of institutions." Besides, according to Meima, there

> were escape clauses in the contract [to purchase the house in Torrington] and it was a long closing at [the seller's] request; so there was plenty of time to put something in place; and, again, I could find any

6. Meima apparently revoked this power of attorney in August 2002.

7. Meima stated that the $22,600.00 was for "legal services related to the Torrington property" and time spent on a Canadian proposal apparently unrelated to the transaction. According to Meima, $8,000.00 of the legal fees were returned to him due to an overpayment.

8. Meima recalled that Broemmel was not "certain" at that time when the building in Denver would sell, but that Broemmel could have told him it would probably sell in April.

9. Meima characterized it as an "investment proposition," rather than "borrowing money."

number of reasons to back out of the deal and recover the $5,000 earnest money.

[¶ 17] Meima had negotiated, or was negotiating, a sale of the Baltic properties to David Kubich, a timber land and sawmill owner, whereby Mr. Kubich would purchase the properties for $120,000.00 and grant Meima an option to repurchase the properties by November 15, 2002, for $140,000.00 (ten percent simple interest with no other conditions or complications, according to Meima). Meima testified that he needed to end the "endless arguments" with his ex-wife about the value of the properties, and to clear title and obtain new title insurance to the properties "particularly with respect to the mineral rights, and . . . a sale to a third individual was the cleanest way to take care of that and to satisfy any and all residual claims from my ex-wife on the property." Meima's ex-wife had signed purchase option agreements up to a value of $3.8 million and "knew the potential [value] was there."

[¶ 18] Meima wanted to tie in the Kubich option with the Torrington house purchase. He essentially wanted to provide Broemmel a purchase option (by assigning Mr. Kubich's "minimal cost position" in the Baltic properties to Broemmel) so that Broemmel would have collateral or security for his role in financing Meima's purchase of the Torrington house. Broemmel would also be reimbursed for the house purchase out of Meima's eighty percent share of the profits from the Baltic properties, but it was "never the agreement" that Broemmel would be reimbursed for the cost of exercising the Kubich option (the two also did not discuss or agree on rent or any other payments with respect to the house purchase). Meima had Broemmel sign a disclosure statement that Meima's ex-wife "would never find out about this" because Meima did not "want her reinvolved in a California divorce. You can come back 20 years later and make some sort of claim on some sort of pretext. I was tired of that."

[¶ 19] Meima had discussed the value of the Baltic properties with Broemmel "in detail" and told Broemmel the properties were

worth $2.5 million. Broemmel went to California in April 2001, to confirm personally the value of the Baltic properties (at least to the extent of the $140,000.00 cost of exercising the Kubich option). At that time, the above-referenced April 29, 2001, addendum to the Torrington house purchase contract was executed, in which all financial contingencies were removed from the house purchase contract and Broemmel's financial statement was submitted to the house's seller. According to Meima, Broemmel had by then agreed to finance the Torrington house purchase, and Meima proceeded with the Kubich transaction.[10] Meima would not have participated in the transaction if Broemmel had not signed the addendum to the Torrington house purchase contract because there was no "compelling necessity" to sell the Baltic properties to Mr. Kubich unless Broemmel financed the Torrington house purchase and participated in the profit-splitting arrangement on the Baltic properties. Broemmel also "subsequently agreed in writing to exercise the Kubich option;" he "bought a 20 percent net profit interest in the property by exercising the Kubich option."

[¶ 20] The documents for the June 2001 closing on the Torrington house were sent to Broemmel and there was no indication that "anything was amiss." Upon receiving the documents, Broemmel refused to proceed with the transaction because "his wife would divorce him. . . ." According to Meima, his contract with the seller of the house was a "specific performance contract," and Meima had "everything at risk;" Broemmel was "basically in total control of everything I had" at "no cost to himself for a year and a half" (the time period in which Broemmel could exercise the Kubich option on the Baltic properties). Meima "was in a total loss position of everything with no place to live, [and] having lost all the cash [he] could raise at that point in time"—he was "compelled to try to work out whatever was necessary to get" Broemmel to proceed with the Torrington house purchase. Meima worked with his realtor and the seller (who was "quite traumatized")

10. According to Meima, the balance of the $120,000.00 in sale proceeds from Mr. Kubich (after expenses) was disbursed to Meima's ex-

wife and her attorney (who was "totally corrupt"); the ex-wife "signed off" and was "out of the picture."

to extend the closing on the house. In order to obtain the extension, the seller required Meima to submit an additional $10,000.00 "nonrefundable deposit" or earnest money the next day.[11]

[¶ 21] Ten to fourteen days later, Broemmel said he "would come to Denver about the house" and Meima ultimately met with Broemmel around July 24, 2001. Broemmel "worked ... up" a contract on his computer (the July 24, 2001, "Terms of Lease/Purchase Agreement") and "presented" it to Meima. With respect to the particular terms of the contract, Meima testified as follows:

(a) The terms as to rent, taxes, insurance, assessments, costs, and expenses were Broemmel's "demand[s]" and were "not discussed." Broemmel also stated that he "didn't care how long it went at $2500 a month...."

(b) Broemmel "wanted additional collateral" and asked what Meima's Celina Flat Mine property was worth. Meima replied that it was worth $10,000.00 or more and Broemmel "wrote in $70,000 as an additional lien against that." Meima did not volunteer this property, and the property was not part of his understanding of the parties' original agreement.

(c) Broemmel had seen the firearms referred to in the agreement at the Denver gun show.

(d) Broemmel wanted, without discussion, the additional $10,000.00 profit.

(e) Broemmel "wanted total control over all property, all assets, and that was, essentially, nonnegotiable. We did establish a two-year term as a reasonable time period to sell or deal on the California property, and he agreed to stand in as trustee for that time period." It was "always a condition of" Meima's that Broemmel "be trustee [of the Northern Commercial Trust] and not owner of record."

(f) The provision as to the profits from the sale of the Baltic properties went "back to the original verbal discussions with an agreement ... that there would be a split of that initially of 20 percent, net, to" Broemmel.

[¶ 22] According to Meima, Broemmel also wanted a promissory note "for his wife," and drafted the July 25, 2001, addendum to the promissory note the following day. Meima testified that, regarding the "trust" language contained in this addendum, he "never would have begun the relationship [with Broemmel] if title was to be taken in Torrington in any other format than Northern Commercial Trust and Broemmel as a trustee." He added that Broemmel was to act as the trustee for Meima's benefit, and was to resign as trustee when the $185,817.91 was paid in full.

[¶ 23] Meima claimed that he signed these written documents because he "really [had] no option at this time because Broemmel controlled without any recourse against him, he controlled the California property;" if Meima did not sign the agreements, Broemmel could "liquidate the Torrington property and liquidate the California property, and there was, essentially, no provision for any recourse against that." Virtually none of the terms were negotiated (or had been discussed previously), "there was no way to negotiate," and Meima was "under duress." Yet, Meima admitted that he was able to clarify a couple of points and that he "got ... some terms regarding Northern Commercial Trust" into "all the purchase agreements." Meima similarly testified that Broemmel drafted the July 27, 2001, power of attorney relating to the Torrington house and Meima signed it because he "had no option;" Broemmel "controlled all the property."

[¶ 24] Meima paid the monthly rent payments through March 2002, but did not pay the property taxes or insurance on the Torrington house.[12] At times, a financial backer made the rent payments directly to Broemmel on Meima's behalf. Meima felt at some point that due to "financial constraints" he

---

11. A cashier's check was purchased by "[A]nthony [M]eima" on June 12, 2001. Meima testified that he liquidated some firearms to obtain these funds.

12. In a letter to the property insurance company, Meima stated "I am not the owner of the property," "I have no contract with anyone to pay insurance on this property," and "[t]here are no circumstances under which I will pay insurance on this property."

"had to market the California property" and stopped paying the rent. Thereafter, the parties' relationship went "rapidly down hill."

[¶ 25] Following the June 2003 sale of a portion of the Baltic properties to Mr. Sinclair, Broemmel "immediately" demanded $142,000.00 from the sale proceeds. There was never an agreement that Broemmel was to receive these funds; it was merely paid at "his request." Meima testified that Broemmel was the owner of record for the Baltic properties, subject to the July 27, 2001, power of attorney and the parties' profit-splitting agreement.

### Broemmel's Testimony

[¶ 26] When the parties met in 2001, Broemmel mentioned that he was in the process of selling a building in Denver and was interested in purchasing firearms collections. Broemmel did not recall discussing any other potential business transactions with Meima at that time. After Broemmel moved to North Carolina on April 10, 2001, he had a "lot" of contact with Meima, who became "very persistent" and "very aggressive...."

[¶ 27] Meima was interested in "having his own home" and at some point offered Broemmel "some incentives" to finance the Torrington house purchase. The parties discussed the Baltic properties (including the Kubich option), valued at over $2 million according to Meima, because Meima was attempting to transfer the properties so his ex-wife would acquiesce to the transfer without having "any information how valuable it was...."[13] Meima promised that in exchange for financing the Torrington house

purchase, Broemmel would receive twenty percent of the "realized profits on the sale or the development of the" Baltic properties, and that was "part of ... our agreement."

[¶ 28] Broemmel could not make any commitments until April, because he would not have any funds until his own building was sold (it sold April 4, 2001). While the parties talked for "quite some time" about Meima's proposal, Broemmel "was never enthusiastic about it. I knew I would probably run it by my wife, and she [would be] against it...."[14] However, if Broemmel "could get in and out of that thing in a short period of time [(six months)], like Mr. Meima told me, then it would be okay" and the proposal seemed like a "worthwhile item to take a look at...." According to Broemmel, Meima assumed "I was going to do it from the get go. His interpretation of my enthusiasm when I didn't have the wherewithal to do it was way beyond what the reality was." Nevertheless, Broemmel verbally "made a commitment" to Meima to finance the Torrington house purchase sometime after April 10, 2001.[15]

[¶ 29] Broemmel did not recall telling Meima the night before the June 2001 closing on the Torrington house that Broemmel would not proceed with the purchase because his wife would object. Rather, according to Broemmel, Meima "hadn't any document for me or any money commitment or anything. It couldn't have been closing;" Meima "didn't have any financial commitment or firm resources that would allow anyone to close the night before [the closing]." Broemmel similarly did not recall ever threatening to not exercise the Kubich option.

---

13. According to Broemmel, Meima repeatedly explained

> how badly his wife had connived or worked in consort with the attorney that she had, as well the judge, ... and that the judge and the attorney had ruled against him, which wasn't fair, and he lost two or three, four million dollars. He got nothing out of all of his property he had; and he had extensive holdings in rental properties. I felt sorry for him.

Broemmel testified that Meima was the "most paranoid person I have ever seen when it c[a]me to his wife. He was afraid to have a telephone in his name. He was afraid to communicate in any way with anyone where they might be able to get his phone number, and he was a mess."

14. Ultimately, Broemmel's wife discovered these transactions and it "cost" him a divorce.

15. On cross-examination, Broemmel further acknowledged: (a) on April 29, 2001, when Broemmel agreed to submit his financial statement to the Torrington house seller, he understood that there were "significant ramifications for doing so" because Meima was "committing the Kubich option" to Broemmel; (b) Broemmel "at some point" committed to financing the Torrington house purchase, "for which [Broemmel was] going to get 20 percent of the California properties as compensation"; and (c) Broemmel was aware that Meima "had put down an additional $10,000, so he had a total of $15,000" in the Torrington house.

[¶ 30] Prior to the July 2001 closing on the Torrington house, Broemmel began putting together the agreement he and Meima had "talked about. We had to have an agreement before we entered into this contract." Broemmel testified as follows regarding the July 24, 2001, lease/purchase agreement, the July 25, 2001, promissory note, and the July 25, 2001, addendum to the promissory note:

Well, it was a summation of all that we had talked about over the previous months on the different conditions for the purchase of the house; and I knew that if I was going to be able to some time in the future justify this to my wife, I would have to make sure that I am very well covered, collaterallywise, or I would risk serious injury to my marriage; so I made sure I reiterated what we had already agreed upon and made sure the collateral was sufficient that I didn't think I had a problem if he would default.

Q [Broemmel's counsel:] Is there anything there that was not agreed to before the document was signed?

A I don't think that we had come to a conclusion yet on the monthly payments that were going to be necessary; and I told him that I had to have this paid back in 6 months, and he said that he could do it; and I said, well, I will charge you $2,000 a month then for the rent on the place to encourage, make sure I do get this paid back, because I don't want to jeopardize my relationship with my wife.

He had already agreed to most of the other terms. He did provide additional collateral by saying he had an additional piece of property, the Celina Flat one, and he gave me that information; and as far as the rifles are concerned, the collection, he had a fellow that had it, and he didn't want to lose that collection; so I paid $16,500 and kept possession of it; and it was stipu-

lated that if he defaults payment for two weeks, I will keep his equity in it; even though I don't know how much more than the $16,500 it was worth.

Meima never objected to any of the terms of these agreements (which agreements were an "assimilation of what [Meima] said, what we had agreed upon, except, basically, for the rent issue") and Broemmel merely "put things in writing which we agreed upon" ("we were trying to get exactly what we needed before the sale actually took place").[16]

[¶ 31] Regarding the trust language in particular, Broemmel testified that he did not know anything about trusts and initially wanted to have the Torrington house titled solely in his name. Meima convinced him to "switch[ ] it" to a trustee; Broemmel would have "complete say over anything that goes on inside the trust; and there is no way that [Broemmel] could get taken advantage of...."[17] That "sounded logical" to Broemmel and he "went ahead and proceeded."

[Meima's counsel:] Did you take this property as trustee of Northern Commercial Trust under your own type of trust agreement, a verbal agreement that you had, that you would hold that property in trust for Mr. Meima?

A We did it specifically for this transaction. That's all I can say. I never saw another trust, so I can't say it was for that trust or for whatever trust. We just named that trust for that transaction.

Q And you would be a trustee, correct?

A Yes.

Q And in your written agreements, the ones that ... we have been looking at, there is a first one and then an addendum, marked Exhibit 14 and 15, you put it in there to hold it for the benefit of Meima, correct?

. . .

Q Okay, No. 10.

---

16. According to Broemmel, the rent was included in the agreements "in lieu of interest," as an incentive for Meima to pay off the house purchase quickly; Meima paid rent to Broemmel as an individual, not as a trustee. Broemmel also had never heard of the Celina Flat property before and Meima "volunteered" that property as additional collateral.

17. Meima "talked [Broemmel] into doing it; and [Broemmel] didn't know anything about it. [Meima] just said [Broemmel was] totally protected if [he had] a trust."

A Yes.

Q So you were acting as a trustee in that capacity?

A Yes.

Q And you and your wife loaned money to the Northern Commercial Trust so the trust could invest in the property?

A I came there to take possession in my own name. I didn't feel comfortable about the trust, no; but when he assured me that everything is in place, then I went ahead and took possession as the trustee.

Broemmel further stated during his testimony that the trust purchased the Torrington property, that Broemmel was "still trustee," that Broemmel lent money to the trust for the Torrington house purchase, and that Broemmel was holding the Torrington house in trust for Meima pending Meima's performance of the lease/purchase agreement.

[¶ 32] Broemmel also agreed at some point to exercise the Kubich option and it was "always" his understanding that he would be reimbursed for the costs to exercise the option; Meima's testimony to the contrary was "absurd." In order to obtain the money to exercise the option, Broemmel ultimately contributed $40,000.00, and another individual agreed to contribute $100,000.00 if Broemmel would pay him $40,000.00 in interest. Broemmel testified that Meima agreed to this arrangement and to reimburse Broemmel for both the $140,000.00 to exercise the option, as well as the $40,000.00 in interest Broemmel paid to the third individual. When a portion of the Baltic properties was sold in 2003, Broemmel received $142,000.00 (apparently $2,000.00 in expenses were incurred in exercising the option) and paid $140,000.00 of it to the third individual.[18]

[¶ 33] Broemmel paid the property taxes and insurance on the Torrington house. Broemmel ultimately claimed that he was owed $185,817.91 for his initial contribution

to the Torrington house purchase, $45,500.00 in rent from April 2002 through October 2003, $2,762.00 for insurance paid on the Torrington house, $4,195.73 for taxes paid on the Torrington house, the $10,000.00 profit for financing the Torrington house purchase, and some other amounts that are not of consequence to this appeal.

### The Lawsuit and the District Court's Decision

[¶ 34] In August 2002, Meima filed a complaint against Broemmel (individually and as trustee of the Northern Commercial Trust Dated July 24, 2001) and Broemmel's wife [19] seeking to quiet title to the Torrington house in Meima. Meima claimed that he was the owner of the house and that Broemmel had no interest in the property based on Meima's (as well as his predecessors') "actual, open, notorious, visible, exclusive and continuous possession of" the property "for a period of ten (10) years immediately preceding the date of the commencement of this action." He further sought such "further relief as to th[e] court appears just and equitable in the premises."

[¶ 35] In his answer to Meima's complaint, Broemmel claimed an interest in the Torrington house and denied that Meima had an interest in the house. Broemmel counterclaimed against Meima, asserting that: (a) Broemmel, as Trustee of the Northern Commercial Trust dated July 24, 2001, owned the property and that Meima resided on the property as a lessee; (b) that Meima and Broemmel entered into a "type of Promissory Note, Lease Purchase Agreement" (the July 25, 2001, Addendum to Promissory Note); (c) that Meima was delinquent in his rental payments and had not reduced the amount of the promissory note; and (d) that Broemmel was owed $185,817.91 as well as

---

18. Meima testified that he did not agree to pay Broemmel this $40,000.00 in interest; that was only disclosed to Meima after Broemmel had already exercised the option. The district court found that Broemmel "originally agreed to hold and exercise the option without any mention of interest on the purchase price. There was no consideration for any subsequent agreement for $40,000 of interest. . . . Any interest expense he

incurred is outside the parties' agreement and Broemmel's own responsibility."

19. Broemmel's wife apparently transferred any interest she had in the Torrington house to Broemmel, so the district court found that Broemmel was, "for all practical purposes, the Defendant in this case."

expenses, including taxes, insurance, assessments, rent, and the $10,000.00 profit.

[¶ 36] Meima answered Broemmel's counterclaims, and included additional factual representations and claims against Broemmel seeking a permanent injunction enjoining Broemmel from transferring the Torrington house and Meima's personal property, and declaratory relief based on economic duress, undue influence, and unconscionability regarding the terms of the Lease/Purchase Agreement, Promissory Note, Addendum to Promissory Note and Mortgage. Broemmel then filed a brief answer to Meima's new claims.

[¶ 37] The district court held a bench trial in October 2003. Meima and Broemmel were the only witnesses who testified during the trial. The district court issued a lengthy, detailed decision letter in April 2004, which letter included the following findings:

(a) The district court aptly noted that this "case presents a good example of why attorneys should be consulted before business agreements are finalized."

(b) The district court deemed "all pleadings amended to conform to the evidence."

(c) Meima "had been in a difficult divorce in California, and wanted to conduct business without his ex-wife being able to track or locate his assets."

(d) Meima and Broemmel verbally initiated two business deals encompassing vague terms and contradictory documents. They ultimately reached two agreements: one for the Torrington house purchase and another for Broemmel's investment in the Baltic properties. The parties "presented disputes" regarding each agreement at trial, requiring the district court to ascertain the terms, and meaning, of each agreement. Each party ultimately "construed those vague terms to their advantage" and "attempted to persuade the Court that the agreements, whether verbal or written, entirely favored each side."

(e) Neither "of the primary parties appeared particularly credible" but Meima's testimony "especially lacked credibility." [20]

**(A) The Torrington House Purchase**

[¶ 38] The district court found that Broemmel agreed to finance Meima's purchase of the Torrington house in late April 2001, "but the parties had not agreed to terms (method, interest, repayment, etc ...)" and proceeded to discuss "the terms of the loan" throughout the summer. "In essence, in April, 2001, the parties made an agreement to agree" and did not mutually assent to sufficiently specific terms at that time. By June 11, 2001, the parties had still not "worked out all the conditions" on the house purchase and Meima's testimony that a complete agreement existed before June 11, 2001, and that Broemmel then "backed out at the last minute to extract additional profit," was "not credible or persuasive." Meima "created his financial condition and wanted to hide assets," and Broemmel did not "intend to provide financing until sufficient terms of repayment, interest and collateral were agreed upon;" Broemmel's reluctance was not "wrongful."

[¶ 39] Instead, the parties agreed to terms sometime after June 11, 2001, and the terms were written into the July 24, 2001, lease/purchase agreement. Meima did not object to any of the contract terms, complied with the terms by paying rent and transferring the rifles to Broemmel, and had assets and failed to explain "why he [did not] utilize those assets to support his purchase" of the Torrington house. Accordingly, Broemmel was not "coercive" and Meima's testimony to the contrary was not persuasive. The district court found that no additional consideration was provided for the July 25, 2001, promissory note, the addendum to that promissory note, or the subsequent mortgage.

[¶ 40] The district court concluded that Meima paid rent to Broemmel from August 2001 to March 2002, but did not pay rent thereafter, nor did Meima pay the property taxes or the insurance for the Torrington house. Due to Meima's default, the district court found that Meima owed $60,500.00 in rent through April 2004, $4,195.73 in property taxes, and $2,762.00 for property insur-

---

20. In an order responding to Meima's post-trial objections to the district court's judgment, the district court stated that Meima's trial testimony was "nearly devoid of credibility...."

ance, and that Broemmel's $10,000.00 profit had previously been satisfied from the Baltic properties sale proceeds consistent with the lease/purchase agreement. The district court declared that Broemmel held title to the Torrington house as an individual, issued an order of ejectment, and terminated the lease/purchase agreement.

### (B) The Baltic Properties

[¶ 41] Meima owned and hoped to sell the Baltic properties, which properties had a potential value of $2.5 million "if properly marketed." Meima initially sold the properties to Mr. Kubich for $120,000.00, and Mr. Kubich agreed that Meima could repurchase the Baltic properties for $140,000.00. According to the district court, Meima participated in this transaction to keep the value of the properties, and/or the properties, "away from [Meima's ex-]wife" and Meima was either "unwilling or unable" to obtain financing from a commercial lender to repurchase the property from Mr. Kubich. Meima asked Broemmel to assume, and pay the $140,000.00 to exercise, the option to repurchase the properties from Mr. Kubich (this served to further hide the properties from Meima's ex-wife and provided Meima the financial backing he "apparently did not have"). Meima and Broemmel planned to sell the properties for a profit, and agreed that Broemmel would "get his $140,000.00 back and receive 20% of the net profits from the eventual re-sale" of the properties.

[¶ 42] The district court found that the parties reached an agreement on the Baltic properties sometime prior to May 25, 2001; the Baltic properties agreement was separate from the Torrington house purchase, and Broemmel agreed to participate in the Baltic properties transaction as an "investment."[21] The district court concluded that the terms of the parties' agreement on the Baltic properties were as follows: (a) Broemmel would obtain and exercise the Kubich option for $140,000.00; (b) Broemmel would control the sale of the Baltic properties until he recovered the money he lent Meima to purchase

the Torrington house or for two years, whichever time period was longer; and (c) the proceeds from future sales of the Baltic properties would be applied to recover Broemmel's $140,000.00 (plus costs) and the balance (after expenses) would be divided eighty percent to Meima and twenty percent to Broemmel, with any stock options split "50–50."

[¶ 43] While the July 24, 2001, lease/purchase agreement contained terms from the parties' Torrington house purchase contract and the parties' Baltic properties agreement, the lease/purchase agreement did not contain all of the parties' terms regarding the Baltic properties. The district court proceeded to construe the following term that did appear in the lease/purchase agreement:

> "[Meima] further grants Tom Broemmel, as trustee, total control of the Baltic properties to sell or do what[ever] is necessary to recover any losses incurred as a result of the purchase of said property. Broemmel will remain as trustee for 2 years or as long as Broemmel has not been paid off for the purchase of Meima's home."

The district court found that the term "losses" in this provision was ambiguous. According to the district court, the parties anticipated that "losses" would exist before the Baltic properties were sold and that the parties intended that such "losses" include the $140,000.00 Broemmel paid to exercise the Kubich option. The district court also found that the term "trustee" in this provision was ambiguous because the identities of the trust, settlor, beneficiary, and trust terms remained unclear and the parties did not intend to create a trust with this language. Instead, the parties intended that for the requisite time period, Broemmel would have the sole authority to approve or reject sales of the Baltic properties in order to ensure that he was paid the amount he contributed to the Torrington house purchase and the $140,000.00 he invested to exercise the Kubich option. The district court concluded

---

21. The district court rejected Meima's argument that Broemmel agreed to finance the Torrington house purchase prior to July 2001 solely in exchange for Broemmel's participation in the Baltic properties deal because Broemmel did not agree "to provide a no-interest loan without collateral or a time for payment in return for a potential profit from the Baltic" properties.

that this construction was consistent with the parties' verbal agreement in early 2001.

[¶ 44] In the fall of 2002, Meima negotiated the sale of a portion of the Baltic properties; the sales price was ultimately $440,000.00. In order to sell this portion of the properties, Broemmel had to pay $140,000.00 plus $2,000.00 in expenses to exercise the option to purchase the properties from Mr. Kubich. The district court found that Broemmel "obtained title" to the properties by exercising the option, but "acknowledge[d] that he only holds the [balance of the properties] subject to the 20%–80% [profit-splitting] agreement." After paying the costs and taxes resulting from the sale, $381,603.21 of the sales proceeds remained and were distributed as follows: $187,003.21 to Meima's trial attorney's trust account, $22,600.00 to Meima's trial attorney, $30,000.00 to Meima's financial backer, and $142,000.00 to Broemmel. Broemmel later received $20,000.00 from the balance retained by Meima's trial attorney's trust account, and Meima similarly received $15,000.00.[22] The district court found that the proceeds from this sale should have been distributed as follows: $142,000.00 to Broemmel, $191,682.56 to Meima (eighty percent), and $47,920.65 to Broemmel (twenty percent).

## STANDARD OF REVIEW

[¶ 45] We review a district court's express findings of fact following a bench trial according to the clearly erroneous standard. We do not

> substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. *Life Care Centers of America, Inc. v. Dexter*, 2003 WY 38, ¶ 7, 65 P.3d 385, ¶ 7 (Wyo.2003). We affirm the trial court's findings if there is any evidence to support them. *Id.* We accept the evidence of the prevailing party as true and give that party the benefit of all favorable inferences that can fairly be drawn from the evidence while disregarding conflicting evidence.

*Narans v. Paulsen*, 803 P.2d 358, 360 (Wyo.1990). A reviewing court will not set aside the court's findings merely because it might have reached a different result. *Conner v. Board of County Commissioners, Natrona County*, 2002 WY 148, ¶ 23, 54 P.3d 1274, ¶ 23 (Wyo.2002). A finding can be "clearly erroneous" even though there is evidence to support it, if after a review of the entire record, the court "is left with the definite and firm conviction that a mistake has been committed." *Hammons v. Table Mountain Ranches Owners Association, Inc.*, 2003 WY 85, ¶ 12, 72 P.3d 1153, ¶ 12 (Wyo.2003). *Keever v. Payless Auto Sales, Inc.*, 2003 WY 147, ¶ 7, 79 P.3d 496, 498 (Wyo.2003). " 'Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence.' " *Saulcy Land Co. v. Jones*, 983 P.2d 1200, 1203 (Wyo.1999) (*quoting Springer v. Blue Cross and Blue Shield of Wyoming*, 944 P.2d 1173, 1175–76 (Wyo. 1997)).

## DISCUSSION

### Existence of Express or Constructive Trust

[¶ 46] Meima first argues that the district court erred in finding that Meima, as settlor, did not create an express trust in which Broemmel, as trustee, would hold the Torrington house in trust for Meima, the trust's sole beneficiary. He contends that all of the parties' written agreements (including the July 24, 2001, lease/purchase agreement) "refer to Tom Broemmel as trustee and/or underscore the fact that he was to hold the Torrington property 'in trust' " for Meima, and that Broemmel admitted in his pleadings and trial testimony that he was to hold the Torrington house "in trust" for Meima.

[¶ 47] Meima further asserts that Broemmel breached his fiduciary duties as trustee because: (a) Broemmel forced Meima to agree to the unconscionable terms contained in the July 24, 2001, lease/purchase agreement; (b) Broemmel pledged the Torrington house as collateral for his purchase (as an individual) of pawn shops in Kentucky;[23] and

---

22. Fifteen dollars for wire transfer fees was also apparently paid from the trust account.

23. Meima testified that at some point, Broemmel said he wanted to "liquidate" the Torrington

(c) Broemmel mortgaged the Torrington house to himself in 2002. Accordingly, Meima argues that he (as the trust's beneficiary) is entitled to the $16,000.00 in rent he paid to Broemmel (less the amount Broemmel paid in property taxes and insurance), and that the Torrington house should be conveyed to Meima because the district court ordered that Broemmel be reimbursed for the money Broemmel contributed to the purchase of the Torrington house.

[¶ 48] Broemmel argues that sufficient evidence supported the district court's decision that an express trust did not exist and that Meima "wants ownership of the home without having to pay anything for it." According to Broemmel, he never intended to "even have a trust;" it was "solely Meima's idea. . . ." There was "no intent to create a trust by a settlor," there "was really not even a settlor, unless Broemmel was so designated," and there was no "ascertainable beneficiary, unless it was Broemmel." Broemmel claims that Meima had a right to lease the Torrington house and to purchase the property if he complied with the terms of the lease agreement. If a trust did exist, Broemmel was the settlor and beneficiary; if Meima was the beneficiary, he did not comply with the terms of the trust in order to receive the benefit therefrom.

[¶ 49] The district court found as follows:

The second sentence of the [July 24, 2001, lease/purchase agreement] states that Broemmel would "hold the property in trust for Meima on a lease/purchase." When Broemmel paid the balance of the purchase price for the house at closing he received a deed listing the grantee as "Thomas Broemmel, Trustee of the Northern Commercial Trust, dated the 24th day of July, 2001." The evidence established that there was no trust dated July 24, 2001. Meima had created a revocable trust called the Northern Commercial Trust in March, 1998, but that trust obviously is not related to the transactions in this case. That trust requires the trustee

to pay the trust's income to Meima. In 2001, [the] parties obviously intended that all rent be paid to Broemmel. The 1998 trust anticipates that the trustee will continue to act after Meima's death and provides for his children. In 2001, the parties obviously intended for Broemmel to be involved with the house only until he was fully paid. The 1998 Northern Commercial Trust establishes Joseph W. Hartnett, not Broemmel, as trustee.

Although the parties used the term "in trust," the evidence establishes that they did not intend or create what the law recognizes as a trust. Their use of that term, both in the July 24, 2001, document and in the deed obtained on that date, was intended to describe the lease-purchase relationship whereby Broemmel would own the property and transfer it to Meima when Meima fully paid. The Court finds that Broemmel is the owner of the residence, and that it is subject to a lease-purchase for Meima. This conclusion is consistent with Meima's representations to State Farm Insurance in August, 2003.

. . .

The Court finds that the parties intended for Broemmel to own the Torrington residence and to lease it to Meima. Title would be transferred to Meima when he fully paid his obligations.

[¶ 50] We have previously determined that "a trust is a fiduciary relationship in which one person is the holder of the title to property subject to an equitable obligation to keep or use the property for the benefit of another." *Scotti's Drive In Restaurants, Inc. v. Mile High–Dart In Corp.*, 526 P.2d 1193, 1196 (Wyo.1974). "The elements of a valid trust include a competent settlor and trustee, intent by the settlor to create a trust, ascertainable trust res, sufficiently ascertainable beneficiary or beneficiaries, a legal purpose, and a legal term." *Hilbert v. Benson*, 917 P.2d 1152, 1157 (Wyo.1996) (citing *McGinnis v. McGinnis*, 391 P.2d

---

house in order to buy pawn shops in Kentucky. Broemmel testified that he had pledged his financial interest in the Torrington house as "collateral" to purchase three pawn shops in Kentucky.

He granted the creditor an option to purchase the house, but the creditor had "no intention of coming here to exercise it or to take the property."

927, 933 (Wyo.1964); *Dallas Dome Wyoming Oil Fields Co. v. Brooder,* 55 Wyo. 109, 127–28, 97 P.2d 311, 318 (1939); *State v. Underwood,* 54 Wyo. 1, 25, 86 P.2d 707, 714 (1939)).

*Jewish Community Ass'n of Casper v. Community First Nat. Bank,* 6 P.3d 1264, 1266 (Wyo.2000).

 [¶ 51] We are particularly concerned in the instant case with whether the purported settlor exhibited the requisite intent to create a trust. One treatise states the following in that regard:

> No particular form of words or conduct is necessary for the manifestation of intention to create a trust. It is possible to create a trust without using the word "trust" or "trustee." Conversely, the mere fact that these words are used does not necessarily indicate an intention to create a trust. The question in each case is whether the settlor manifested an intention to create the kind of relationship that to lawyers is known as a trust, that is to say, whether the settlor manifested an intention to impose upon himself or upon a transferee of the property equitable duties to deal with the property for the benefit of another person.

I William F. Fratcher, *Scott on Trusts,* § 24 (4th ed.1987).[24]

 [¶ 52] Generally, the "question whether the parties in their dealings have created a trust is one of fact to be determined largely by ascertaining the intent of the parties. The intent to create the trust must be clear and unequivocal." 76 Am. Jur.2d *Trusts* § 57 (2005) (footnotes omitted). *See generally also, for example, Matter of Estate of Daniels,* 665 P.2d 594, 596–97 (Colo.1983) and *Matter of Estate of Binder,* 386 N.W.2d 910, 912 (N.D.1986). Such intent can be inferred

> from the nature of property transactions, the circumstances surrounding the holding of and transfer of property, the particular documents or language employed, and the conduct of the parties.... While such an inference is not to come easily—"[c]lear, explicit, definite, unequivocal and unambiguous language or conduct" establishing the intent to create a trust is required ...—no *particular* language must be used to create a trust or to manifest the necessary intention to create a trust.

*Bishop and Diocese of Colorado v. Mote,* 716 P.2d 85, 100–01 (Colo.), *cert. denied,* 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986) (emphasis in original). *See also Matter of Estate of Vallery,* 883 P.2d 24, 27 (Colo.App. 1993).[25]

[¶ 53] This issue arises amidst a myriad of incongruent and inconsistent documents, legal terminology, witness testimony (mostly self-serving and of dubious value due to the district court's credibility findings), and positions advocated by the parties.[26] It appears from our review of the circumstances that different aspects of the language contained in the written documents at issue, and of the conduct relative to the Torrington house pur-

---

**24.** *See also* Restatement (Second) of Trusts § 24 cmt. b (1959) and 76 Am.Jur.2d *Trusts* § 58 (2005).

**25.** According to 76 Am.Jur.2d *Trusts, supra,* § 59 (footnotes omitted):

> Ordinarily an intention to create a trust may be manifested by inference from those things which a trustor has said or done, from the nature of a transaction, or from the circumstances surrounding creation of the purported trust. That is, when the language of the parties fails to clearly indicate their intention to create an express trust, such intention may be ascertained by other objective manifestations of intent, such as the facts and circumstances surrounding the transactions and the relationship of the parties. The intent to create a trust can be inferred from the nature of property transactions, the circumstances surrounding the holding of and transfer of property, the particular documents or language employed, and the conduct of the parties, although the inference of an intent to create a trust must come from clear, explicit, definite, unequivocal, and unambiguous language or conduct.

**26.** For example, Meima stated in his answer to Broemmel's counterclaims (as well as other pleadings) that despite Meima's objections, Broemmel "insisted he hold title to the property in his name as trustee of [Meima's] revocable trust" and that the Northern Commercial Trust dated July 24, 2001, "has never existed." Broemmel has also at times seemed to acknowledge in pleadings and during his trial testimony that a trust existed and that he was the trustee.

chase, can be relied upon to support opposite conclusions. For example, on the one hand:

(a) In the sales contract between Meima and the Torrington house seller, the Northern Commercial Trust was named as the buyer, the house was to be conveyed to the Northern Commercial Trust, and "Anthony Meima" executed the agreement on behalf of the Northern Commercial Trust (listing an address in Nevada City, CA). One might infer that Meima initially intended his Northern Commercial Trust of 1998 to be involved in this matter, and the parties now apparently agree that the 1998 Northern Commercial Trust is not the trust referred to in later documents.

(b) The July 24, 2001, agreement states that "Broemmel agrees to hold property in trust for Meima," refers to "Meima's home," and to whatever extent it may be relevant, uses "trustee" language in referring to Broemmel and the Baltic properties.

(c) The closing statement for the Torrington house purchase names "Thomas Broemmel, Trustee of the Northern Commercial Trust" as the buyer and was signed by "Thomas Broemmel, Trustee."

(d) The Torrington house was deeded to "THOMAS BROEMMEL, Trustee of the Northern Commercial Trust, dated the 24th day of July, 2001."

(e) The July 25, 2001, Promissory Note states that for "value receive[d], to wit: Property held in trust, [the Torrington house,]" Meima promises to pay Broemmel $185,817.91. The July 25, 2001, addendum further states that "Broemmel agrees to hold property in trust for Meima," that "Broemmel, as trustee of Northern Commercial Trust, has sole authority to sell or convey said property in his own name until he is paid in full the $185,817.91 and all costs and expenses associated with this acquisition," that the "Northern Commercial Trust is limited to an agreement by Tom Broemmel to hold [the Torrington house] for the benefit of Anthony Meima

pending performance of all terms of this preceding lease/purchase agreement by Anthony Meima," and uses "trustee" language in referring to Broemmel and the Baltic properties.

(f) The July 24, 2002, mortgage names the Northern Commercial Trust as mortgagor of the Torrington house and Broemmel and his wife as mortgagees; Thomas C. Broemmel signed the mortgage on behalf of the Northern Commercial Trust.[27]

[¶ 54] Other circumstances place this language and conduct in an entirely different context, especially given the level of clarity required in order to infer the intent to create a trust. For example:

(a) Meima, individually, apparently contributed the earnest money for the Torrington house purchase.

(b) Broemmel, individually, is named as the buyer of the Kubich option.

(c) The July 24, 2001, agreement (signed by Broemmel as "Owner" and Meima as "Buyer") is titled "Lease/Purchase Agreement," states that Broemmel agrees to hold the Torrington house "in trust for Meima *on a lease/purchase*" (emphasis added), uses the terms "home loan" and "debt" in referring to the Torrington house purchase, requires that Meima pay a monthly "lease payment" and a $10,000.00 "profit" to Broemmel, requires Meima to pay Broemmel the $185,817.91 (plus expenses) Broemmel contributed to the Torrington house purchase, requires Meima to pay all property taxes, insurance, costs and expenses, and details the additional "collateral" available to Broemmel in the event of Meima's "default." The agreement also does not appear to delineate any particular duties for Broemmel regarding the Torrington house.

(d) Meima subsequently paid rent for several months and transferred rifles to Broemmel consistent with the terms of the agreement.

(e) The July 25, 2001, "Promissory Note" names Meima (individually) as the

---

27. According to the district court, "Broemmel became concerned that he could not act as the owner under the lease-purchase agreement because he did not appear as the record owner. In an ill-advised attempt to remedy this problem Broemmel executed a mortgage covering the residence in favor of himself...."

"Borrower" and Broemmel and his wife (individually) as the "Lender," states that Meima promises to pay the Lender $185,817.91, a $2,000.00 monthly "lease payment" and $10,000.00 "profit," that upon the occurrence of a "default" event the Borrower's obligations "shall become due immediately, without demand or notice," and requires Broemmel to execute a deed "giving up any and all further interest he may have" in the Torrington house upon his receipt of all moneys due Broemmel. The July 25, 2001, addendum also contains the same language we emphasized in the previous subsection of this opinion.

(f) On July 27, 2001, "Anthony Meima" granted "Thomas C. Broemmel" a "Specific Power of Attorney" in all matters relating to the Torrington house, on behalf of Meima "personally and for [his] trust, Northern Commercial Trust," and further granted Broemmel the authority to sell the property to satisfy the promissory note if Meima defaulted on the note.

(g) Meima declared to the Torrington house insurer that he was "not the owner of" the house.

(h) In a March 2002 receipt to Meima acknowledging that Meima had paid rent through February 2002, Broemmel signed the receipt individually as "Landlord."

[¶ 55] Considering our appellate standard of review and the particular circumstances of the instant case,[28] we conclude as the Colorado Supreme Court did in *Matter of Estate of Daniels*, 665 P.2d at 596, wherein the court found that when different aspects of the relevant evidence could support opposite conclusions regarding a settlor's intent to create a trust, the "trial court's conclusion, based on this conflicting evidence, that [the settlor] had no intent to create the trust is therefore binding upon us."

[¶ 56] Meima also argues that we should impose a constructive trust in favor of Meima on both the Torrington house and the Baltic properties. Broemmel contends that we should not consider Meima's argument because this issue was not raised

at trial. In response to Broemmel's argument, Meima merely states that it is "clear that the existence of a trust relationship was at issue throughout this case, be it express, oral, constructive or otherwise." We will

ordinarily entertain only arguments raised in the court below. *Cooper v. Town of Pinedale*, 1 P.3d 1197, 1208 (Wyo.2000). Exceptions to this rule exist if the argument is jurisdictional, or if it is "of such a fundamental nature that it must be considered." *Id.* (citing *WW Enterprises v. City of Cheyenne*, 956 P.2d 353, 356 (Wyo.1998) and *Bredthauer v. TSP*, 864 P.2d 442, 447 (Wyo.1993)).

*Hammons v. Table Mountain Ranches Owners Ass'n, Inc.*, 2003 WY 85, ¶ 17, 72 P.3d 1153, 1156 (Wyo.2003). We conclude that Meima has not directed us to specific evidence indicating that this issue was sufficiently raised in the district court, and does not argue that the issue meets either of the above-listed exceptions.

### Existence of Oral Contract Prior to July 24, 2001

[¶ 57] Meima contends that the district court erred in finding that an oral contact between the parties did not exist prior to July 24, 2001. According to Meima, "the record shows that the parties had a meeting of the minds and intended that an oral contract exist by May 25, 2001," the terms of which oral contract were purportedly as follows:

(a) Broemmel would finance "roughly" $190,000.00 of the Torrington house purchase for Meima in exchange for twenty percent of the "net profits of any future sales of the California properties[,] valued at over $2,500,000.00, if said properties were purchased from Mr. Kubich by either" Broemmel or an assignee;

(b) the Torrington house would be purchased by the Northern Commercial Trust and held in trust by Broemmel for Meima's benefit;

---

28. " '[I]n general at least, no trust is created where the transaction is as consistent with another type of transaction as with that of a trust.' " *Dallas Dome Wyoming Oil Fields Co. v. Brooder*, 55 Wyo. 109, 97 P.2d 311, 317–18 (1939) (*quoting* 65 C.J. 280).

(c) the Kubich option would be assigned to Broemmel so that "he could purchase the California properties and hold clear title to them in his name" subject to the agreement to split any net profits; and

(d) Meima would market, develop, and sell the Baltic properties.

Meima concludes that Broemmel subsequently breached this oral contract, and that the July 24, 2001, lease/purchase agreement is void due to a lack of additional consideration.

[¶ 58] Meima's argument as to the existence, and terms, of such an oral contract is based on his own trial testimony,[29] his particular characterization of the record *according to that testimony,* and these resulting suppositions:

(a) The record does not contain any evidence that the assignment of the Kubich option to Broemmel in May 2001 was a gift, so "clearly, the conveyance was made in consideration for something." It is "illogical, counter-intuitive, and against the weight of the entire record for the District Court to assume that Meima would transfer the rights to $2.5 million worth of real estate to Broemmel without having a contract in place." If there was no contract, Meima "clearly would not have taken the steps necessary to secure a real estate purchase option allowing" Broemmel to purchase the Baltic properties for only $140,000.00.

(b) The parties "must have" agreed they would share in the development and sale of the Baltic properties, or why would Broemmel execute the April 29, 2001, addendum to the Torrington house purchase contract that removed all of the financing contingencies? The parties "must have" agreed to contract terms prior to that time, or why would Broemmel agree to provide a copy of his financing statement to the seller of the Torrington house in April 2001?

"Whether an oral contract exists is a question of fact to be determined by the trier of fact." *Fowler v. Fowler,* 933 P.2d 502, 504 (Wyo.1997). The premise of Meima's argument on this issue presumes that his trial testimony was credible. The district court found that Meima's trial testimony "especially lacked credibility." Issues of "credibility and the weight to be given to testimony are matters to be resolved by the trier of fact" and we "may not substitute our judgment for that of a trial court with respect to issues concerning credibility." *Wallop v. Wallop,* 2004 WY 46, ¶ 10, 88 P.3d 1022, 1025 (Wyo. 2004). *See also Keever,* 2003 WY 147, ¶ 14, 79 P.3d at 500. Accordingly, we need not consider this issue further.

### *Validity of July 24, 2001, Lease/Purchase Agreement*

[¶ 59] Meima asserts that the district court erred in rejecting his claims that the parties' July 24, 2001, lease/purchase agreement was invalid due to a lack of consideration, economic duress, undue influence, or unconscionability of terms. On appeal, however, Meima's arguments are similarly based on his trial testimony and his particular view of the record according to that testimony. For example:

(a) In a single paragraph, Meima argues that because the parties had a valid oral agreement in April or May of 2001, the July 24, 2001, lease/purchase agreement was void due to a lack of consideration for *additional terms* that, "[a]ccording to Mr. Meima's testimony," the parties had not previously discussed;

(b) In asserting that the July 24, 2001, lease/purchase agreement was void due to economic duress or undue influence, Meima: (1) reiterates his prior contention that the parties had a valid oral agreement prior to the lease/purchase agreement; (2) references "evidence" that he claims "overwhelmingly supports [Meima's] testimony" that Broemmel "had, in fact, controlled

---

**29.** Meima cites to seven pages of Broemmel's testimony in support of his general statement that "the record shows that the parties had a meeting of the minds and intended that an oral contract exist by May 25, 2001," but does not specifically analyze that testimony. The testimo-nial excerpts do not reflect the entirety of Broemmel's testimony and any attempt to corroborate Meima's testimony is unavailing because the district court found that Meima's testimony was not credible.

most of [Meima's] assets as of July 24, 2001;" (3) argues that the evidence "suggests" Broemmel "would have backed out of the second closing" if Meima did not agree to the terms contained in the July 24, 2001, lease/purchase agreement; and (4) concludes that Broemmel "forced" the lease/purchase agreement on Meima because he demanded such additional terms "only after [he] obtained complete control over nearly all of [Meima's] assets," and Meima "involuntarily accepted the terms" because he had no "other meaningful choice" or alternative; and

(c) In arguing that the lease/purchase agreement was void due to unconscionable terms, Meima references his prior arguments on economic duress/undue influence and merely states that Broemmel therefore deprived Meima of "a meaningful choice about whether or not to enter an inequitable agreement" with no "opportunity for meaningful negotiations regarding the terms of the agreement."

We need not address these issues because the applicable standard of review precludes us from substituting our judgment for that of the district court regarding the credibility of Meima's trial testimony, and from reweighing disputed evidence.

### The District Court's Jurisdiction

[¶ 60] Meima contends that despite the fact that the issues concerning the Baltic properties were "primarily separate and unrelated" to the instant quiet title action regarding the Torrington house, and that the district court did not "have all of the evidence on the issue[s]" because "neither party intended to argue the terms of the California property agreement, except to the extent it pertained to the Torrington property," the district court nevertheless "chose to create and construe agreements between [the parties] pertaining to" the Baltic properties. He asserts that since the Baltic properties are situate in California, the district court lacked subject matter jurisdiction to affect the title to, and the disposition of, such properties by

virtue of its judgment in the instant case. According to Meima, we should therefore void that portion of the district court's judgment.

[¶ 61] We first note that the nature and extent of the parties' agreement on the Baltic properties, in terms of the personal rights and obligations of each party to the other, was clearly at issue in the instant case.[30] Some of the terms of the parties' agreement on the Baltic properties appear in several exhibits attached to the parties' pretrial pleadings, which pleadings also contain a myriad of facts, claims and defenses (seemingly both legal and equitable in nature). At trial, Meima testified extensively about the Baltic properties, including: (a) his personal history with the properties; (b) his dealings with Broemmel, Mr. Kubich, Meima's ex-wife, Calais Resources, a financial backer, and Mr. Sinclair (who bought a portion of the properties in 2003), regarding the properties; (c) the 2003 sale of a portion of the properties and the manner in which the proceeds were, and should be, distributed between Meima and Broemmel; and (d) that he was seeking, in terms of what he wanted the district court "to do," an "order on a fair disbursal of the remaining" 2003 sale proceeds. Broemmel similarly testified as to: (a) his dealings with Meima and Calais Resources on the Baltic properties; (b) Meima's dealings with his ex-wife relative to the properties; and (c) the terms of, and circumstances surrounding, his exercise of the Kubich option.

[¶ 62] Meima's attorney also introduced into evidence several trial exhibits that: (a) either contained contractual terms relative to the Baltic properties or detailed conduct that each party claims supports his view of the agreements at issue; (b) included the closing statements from the 2003 sale of a portion of the Baltic properties indicating how the sale proceeds were distributed; and (c) included Meima's trial attorney's trust account records detailing additional disbursements of the 2003 sale proceeds and the balance in the

---

30. In arguing that the Baltic properties were "primarily separate and unrelated" to the instant case, Meima makes no attempt to analyze, and does not cite to any pertinent legal authority addressing, the district court's subject matter jurisdiction *vis a vis* the particular claims asserted, or the relief sought, by the parties.

trust account that the district court needed to allocate between the parties. In Meima's closing arguments, he conveyed his view of the terms of the parties' agreement on the Baltic properties, and specifically asked the district court to disburse the proceeds from the 2003 sale of a portion of the Baltic properties according to his particular view of the parties' agreement. Broemmel similarly argued for his version of the parties' agreement and asked the district court to disburse the 2003 sale proceeds accordingly.

[¶ 63] The district court noted in its findings that the "parties presented disputes regarding [the Torrington house purchase agreement and the Baltic properties agreement], and a decision in this case requires the Court to ascertain the meaning of these contracts," and also stated the following in response to Meima's post-trial objections to the district court's judgment:

> [Meima] claims that the parties' agreement about California property (the Baltic property) was not at issue in this case. The Court found all pleadings should be amended to conform to the evidence. The evidence and the argument of counsel clearly put the interpretation of the parties' relationship on the Baltic property, and allocation of proceeds from the Baltic property, at issue. [Meima] specifically asked the Court to order distribution of proceeds from sale of some of the Baltic property. The Court had to interpret the parties' agreement about the Baltic property to accurately order a distribution of the proceeds.

[¶ 64] The only legal issue analyzed by Meima (and which is supported by citation to pertinent legal authority) is whether the district court's judgment directly affected the title to real property located in another state. "We distinguish between a judgment directed at the property itself and one directed against the owner of the property." *Breitenstine v. Breitenstine,* 2003 WY 16, ¶ 26, 62 P.3d 587, 594 (Wyo.2003). We have stated that we

> think the issue settled, at least since *Fall v. Eastin,* 215 U.S. 1, 30 S.Ct. 3, 54 L.Ed. 65, 23 L.R.A., N.S., 924 (1909), that the court of one state has no power to directly

affect title to land located wholly within the borders of another. Decrees and judgments purporting to this effect are void, and to the extent the decree before us purports to so do it must fail. However, we consider it equally well established that a court of equity having authority to act upon the person may indirectly act upon real estate located in another state, through the instrumentality of its equity power over the person. *Fall v. Eastin,* supra; *Rozan v. Rozan,* 49 Cal.2d 322, 317 P.2d 11 (1957), reh. denied; *Weesner v. Weesner,* 168 Neb. 346, 95 N.W.2d 682 (1959); *McElreath v. McElreath,* 162 Tex. 190, 345 S.W.2d 722, reh. denied, (1961); 34 A.L.R.3d 962.

*Kane v. Kane,* 577 P.2d 172, 175–76 (Wyo. 1978).

[¶ 65] While no appellate issue has been raised as to the res judicata or collateral estoppel effect of the judgment in the instant case, we find that the following general statement is also relevant to our discussion of this issue:

> Even in actions not limited to an attempt, at the situs of real property, to compel a party to execute a conveyance of the property in compliance with an order by a court in another state directing him to convey such property, it has been held in a number of cases that where a court has jurisdiction over the parties to an action which is within its jurisdiction—such as an action involving divorce, fraud, partnership, trusts, breach of contract, or cancellation of instruments—the court has the power fully to adjudicate the parties' respective rights involved in the action, and under such circumstances a decree dealing with out-of-state real property, though incapable of operating directly on such property as an in rem decree, is entitled to res judicata or collateral estoppel effect as an in personam determination of the parties' personal rights or equities with respect to such property.

Sheldon R. Shapiro, Annotation, *Res Judicata or Collateral Estoppel Effect, In State Where Real Property Is Located, of Foreign Decree Dealing With Such Property,* 32 A.L.R.3d 1330, 1341 (1970 and Supp.2005).

*See generally also, for example, Allis v. Allis,* 378 F.2d 721 (5th Cir.), *cert. denied,* 389 U.S. 953, 88 S.Ct. 337, 19 L.Ed.2d 363 (1967); *Andre v. Morrow,* 106 Idaho 455, 680 P.2d 1355, 1361 (1984); *Lyle Cashion Co. v. McKendrick,* 227 Miss. 894, 87 So.2d 289 (1956); *Small v. Carey,* 269 Or. 35, 522 P.2d 1202 (1974); and *Silver Surprize, Inc. v. Sunshine Mining Co.,* 74 Wash.2d 519, 445 P.2d 334, 338–39 (1968).

[¶ 66] It is undisputed that the district court had personal jurisdiction over both parties in the instant case, and neither party alleges on appeal that the district court lacked such jurisdiction. The district court established, and construed, the terms of the parties' agreement concerning the Baltic properties based on the evidence presented at trial. It then entered a judgment based on its findings (as previously set forth herein), in which judgment it ordered Meima to pay Broemmel $27,920.65 for Broemmel's remaining share of the profit from the 2003 sale of a portion of the Baltic properties (the balance of the proceeds after Broemmel had been reimbursed $142,000.00 for exercising the Kubich option and disbursed an additional $20,000.00), and that any "profits received from the remaining unsold Baltic properties . . . should be divided" eighty percent to Meima and twenty percent to Broemmel.

[¶ 67] We conclude that the district court's judgment did not directly affect the title to the Baltic properties. Indeed, the title to the Baltic properties was not the subject matter of the instant case. The parties essentially agreed that Broemmel (by virtue of his having previously exercised the Kubich option) held title to the Baltic properties subject to the terms of whatever enforceable agreements the parties had executed.

The district court's findings and judgment instead focused on determining the personal rights and obligations of each party to the other, such as the relationship of the Baltic properties agreement to the Torrington house purchase and the nature and terms of the parties' agreement on the Baltic properties (including the Kubich option and particularly whether Broemmel was entitled to reimbursement for the $142,000.00 he paid to exercise the Kubich option, as well as how existing and future profits from the sales of the Baltic properties should be distributed between the parties).[31] To that extent, the district court's judgment clearly was proper.

### The District Court's Judgment

[¶ 68] Meima contends that, assuming that this Court affirms the district court on the issues previously discussed herein, the district court's judgment was nevertheless erroneous. He first argues that the district court should have credited Meima for the $15,000.00 in earnest money he paid towards the purchase of the Torrington house. In advancing this argument, Meima does not cite to any pertinent legal authority, or any contractual term, indicating that he was entitled to such a credit.

[¶ 69] Meima similarly claims that the district court erred in not granting Meima a $70,000.00 credit for the Celina Flat Mine property. According to Meima, he was entitled to that credit because "this property has already been conveyed" to Broemmel. Meima does not cite to any pertinent legal authority in advancing this argument, nor does he direct us to any evidence in the record indicating that the Celina Flat Mine property actually was ever *conveyed* to Broemmel.[32]

---

31. *See generally Markel v. Phoenix Title & Trust Co.,* 100 Ariz. 53, 410 P.2d 662, 664 (1966) and *MacDonald v. Dexter,* 234 Ill. 517, 85 N.E. 209, 212 (1908) ("[w]hatever right or claim appellant might have as to the profits would not require the court to deal directly with the land itself, and would not, therefore, affect the real estate; hence it affords no objection to the jurisdiction of the Missouri court, which had all the parties in interest before it, even though the land out of which the profits were to arise was without the jurisdiction of the court").

32. The July 24, 2001, lease/purchase agreement did state that Meima would provide the Celina Flat Mine property to Broemmel "free and clear of encumbrances" and Broemmel could sell the property if Meima defaulted in his monthly payments for two months. However, the only other evidence on this issue appears to be: (a) the district court's statement in response to Meima's post-trial objections to the district court's judgment that it had merely found that Broemmel held the Celina Flat Mine property as "collateral only;" and (b) Broemmel's trial testimony that he "never put a lien on that Celina property. I just trusted it was there."

[¶ 70] Meima lastly asserts that the district court erroneously construed the following term of the parties' agreement on the Baltic properties:

> 8. [Meima] further grants Tom Broemmel, as trustee, total control of the Baltic properties to sell or do [whatever] is necessary to recover any losses incurred as a result of the purchase of said property.

The district court found that the term "losses" was ambiguous, that the parties anticipated that losses would exist before the Baltic properties were resold, and that one such loss was the $140,000.00 Broemmel paid to exercise the Kubich option. Meima claims that the district court's construction was "clearly erroneous and not supported by the evidence" and offers his own construction of the provision at issue.[33]

[¶ 71] It does not appear from Meima's appellate argument that he disagrees with the district court's finding that the term "losses" was ambiguous. If a contract term is ambiguous, extrinsic evidence may be considered to determine the intent of the parties. *Brown v. Johnston*, 2004 WY 17, ¶ 23, 85 P.3d 422, 429 (Wyo.2004). In that instance, " 'there exists a question of intent which the trier of fact must resolve.' " *Western Utility Contractors, Inc. v. City of Casper*, 731 P.2d 24, 28 (Wyo.1986) (*quoting Goodwin v. Upper Crust of Wyoming, Inc.*, 624 P.2d 1192, 1195 (Wyo.1981)). Based on our review of the record, we find no reason to disturb the district court's findings on this issue. *See Western Utility Contractors, Inc.*, 731 P.2d at 28.

[¶ 72] We affirm.

---

33. The only pertinent legal authority Meima cites to support this argument is the Black's Law

Dictionary definition of "option."